**SNYDER–LYNCH MOTORS, INC.**

v.

**UNITED STATES.**

No. 233–57.

United States Court of Claims.
July 19, 1961.

---

7. 26 U.S.C. (1958 ed.) § 7422(a).

908

Jack E. Hildreth, Los Angeles, Cal., for plaintiff. William F. Peters and Spencer E. Van Dyke, Los Angeles, Cal., on the briefs.

John F. Wolf, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., for defendant.

LARAMORE, Judge.

This is an action for damages arising out of two contracts. Under a facilities contract, Ord–244, the Government agreed to furnish plaintiff certain facilities needed to perform a supply contract. The second contract, DA–04–495–ORD–242, in the amount of $1,054,207.50, was for the rebuilding of 750 tank engines.

Plaintiff claims for recovery in four counts against the United States, the sum of $782,167.23 for alleged misrepresentation and breach of the two contracts above referred to. Under count one, claim is made for $101,739.16 of additional costs for extra work in the procurement of parts for the rebuilding of 750 GAA engines for M4A3 tanks, by reason of misrepresentation of the replacement parts required and procured on behalf of defendant.

Under count two, claim is made for $92,544.18 of increased costs by reason of the refusal and neglect of defendant's authorized agents to comply with the contract provisions, and their interference with plaintiff's efficient performance.

Under count three, claim is made for damages of $582,883.89 against the defendant for withholding of reimbursement payments due plaintiff under its contract that required, in part, the procurement of engine parts on behalf of the defendant.

Under count four, claim is made for $5,000 of increased costs to plaintiff by reason of the failure of the defendant to inspect facilities within a reasonable time, which had been procured and installed on behalf of the defendant, under

a facilities contract, for use in rebuilding the 750 GAA engines, thereby delaying the reimbursement to plaintiff for its costs in acquiring and installing said facilities.[1]

The facts are voluminous and will be referred to here only to the extent necessary to each count of plaintiff's claim. Each count will be dealt with separately. The facts respecting each contract are fully found by the commissioner and adopted by the court.

Under count one of plaintiff's claim the charge is made that defendant misrepresented the amount of replacement parts required.

The facts show that the defendant, after considerable experience under a like contract with the firm of Bowen and McLaughlin, on October 31, 1951, sent Mr. Wesley M. Sandidge, Chief of the Tank Automotive Branch, and Mr. Thomas E. Carpenter, a contract negotiator with the Los Angeles Ordnance District (LAOD), to plaintiff's plant with the view of interesting plaintiff in rebuilding tank engines.

After certain negotiations plaintiff decided to bid on the rebuilding process. Prior to submitting its bid, the plaintiff requested a specimen engine that could be torn down and rebuilt for a practical test of the time and labor involved. The plaintiff was unable to obtain such an engine through LAOD, but did acquire one from another source for this purpose.

Following its study, plaintiff submitted a bid of $911.32 per engine. However, plaintiff's representatives were advised that this sum was too high and plaintiff agreed to refigure it. Finally, a revised estimate was submitted which, after certain adjustment, was in the amount of $605.61 per engine. However, at no time

did the plaintiff submit a bid estimate of $800 for parts in rebuilding the engine. Plaintiff was advised by Mr. Sandidge, Chief of the Tank Automotive Division, and Mr. Henry C. Genthe, a contract negotiator, that the cost would be about $800 for each engine, and the plaintiff relied on this estimate in figuring its fixed price bid for rebuilding. The award was then diverted from Bowen and McLaughlin to plaintiff, Snyder-Lynch Motors, Inc.

The facts further show that when the first contract was awarded to Bowen and McLaughlin for the same rebuilding early in 1951, there was very little information available for a determination of the cost or requirements of replacement parts. The estimate of $800 per engine proposed by the contract negotiator was merely for the purpose of an allotment of funds.

When the procurement order was received for the 750 engines, the defendant was in possession of information resulting from the experience of Bowen and McLaughlin that the cost of parts would substantially exceed the original estimate of $800. As a matter of fact, the cost of parts was approximately 145.5 percent over and above the estimated requirements. However, plaintiff was not advised of these facts and actually had no information regarding the required replacement parts, or the cost of the same at the time its contract was negotiated.

Based on these and other facts of record, the comissioner has found that:

"It is reasonable to conclude that the contracting officer, the contract negotiator and LAOD knew that $800 per engine was inadequate for the cost of replacement of parts prior to negotiating the plaintiff's contract,

---

1. In count four of plaintiff's petition, plaintiff claims the sum of $5,000. However, from referral of the matter for prehearing audit pursuant to Rule 28B3, it was determined that plaintiff's original claim was insufficient and plaintiff's claim should properly be increased to $8,232.-94, if based on carrying charges alone. It is conceded that the damages based on interest or carrying charges for mere- .

ly failure to pay money are not recoverable herein, and that the measure of damages should have been determined on the basis of the extra expense plaintiff had to incur, including unnecessary payment of rent for four months after the contract had been completed and prior to inspection, and necessary expenses for plant protection officers and related costs.

but that the estimate of $800 per engine was used in plaintiff's contract for the firm commitment of funds in the fiscal period, as had been done in the Bowen & McLaughlin contract in early 1951."

We think the Government was remiss in not making the information regarding the Bowen and McLaughlin experience available to plaintiff. Based on this conclusion, the withholding of this information constituted a breach of the contract, and the plaintiff is entitled to recover the damages flowing therefrom. Ragonese, et al. v. United States, 128 Ct. Cl. 156, 120 F.Supp. 768; Bateson-Stolte, Inc. v. United States, Ct.Cl., 172 F.Supp. 454. Plaintiff's unrecovered indirect costs of procuring the tank engine parts was $87,587.06. Plaintiff is entitled to damages in that amount on count one of its claim for the breach of the contract.

In count two plaintiff contends that defendant's inspectors and agents interfered with plaintiff's usual and customary operations and imposed certain requirements in violation of the contract provisions and specifications for the rebuilding of tank engines under contract Ord–242.

Plaintiff's theory of this claim is that the defendant's inspector, Jones, was responsible for all excess costs to June 30, 1952. This is not sustained by the evidence. Conceding, however, that defendant did interfere with plaintiff's operations, the record discloses and the commissioner has found that there is no proof of any excess costs that may be attributed to any improper action or failure on the part of defendant's inspectors or officials. Under these circumstances, plaintiff cannot recover on this item of the claim for failure to prove damages, and count two will be dismissed.

Count three is for damages resulting from defendant's alleged withholding of reimbursement payments due plaintiff under the contract. Plaintiff contends that the action of the defendant in withholding, from payments for reimbursable items, amounts to cover checks issued for reimbursement for direct charges, which checks had not cleared the bank within 30 days from the date of the checks, amounts to arbitrary and capricious action. Plaintiff then says that because of such action it was unable to continue its financing arrangements and that by reason thereof plaintiff was forced to and did sell its automobile agency together with equipment and inventory and that it thereby suffered a loss.

In respect to the above contention, the facts show that in reviewing certain costs, in September of 1952, preliminary to the price redetermination audit, the Army Audit Agency (AAA) found that plaintiff's records were delinquent in many respects.

By letter of September 18, 1952, the AAA, reported to LAOD that during recent examinations of costs pertaining to voucher audits, and in review of certain costs preliminary to the price redetermination audit, it was found that plaintiff's records were delinquent in many respects. It was pointed out that checks drawn in payment of invoices were posted before the liability for such invoices was recorded, which reflected an understatement of accounts payable. In a reconcilement of plaintiff's bank statement for July 1952, it was determined that outstanding checks of $382,031.90 would result in a bank overdraft of $194,713.07. This matter had been discussed with plaintiff's comptroller, who explained the procedure that many of the checks issued upon delivery of parts and verification of invoices were not actually outstanding, but were held by him for later release, amounting to approximately $179,389.70. But even considering the amounts for which payments were not yet due, the overdraft would be in excess of $15,000 upon payment of other checks issued.

The AAA recommended that the contracting officer instruct the contractor to bring its records into a current basis and maintain them in accordance with recognized practices, and that the contractor be instructed to provide weekly bank statements for use of the AAA auditor in verifying payments of checks issued.

The contracting officer was advised that the AAA would continue to make its audit determinations with the understanding that invoices supporting the reimbursement vouchers had been paid or were in the process of payment, but that in the event it was disclosed that vendors' invoices were not paid promptly, recoupment would be made of costs previously approved. The contracting officer was advised that under this procedure the AAA auditor would permit a reasonable lapse of time for the clearance of checks and payments by the bank.

The action of the defendant appears to be in conformity with Title II–G of the contract, which provides:

"*Cost Records and Audit:*

"The Contractor shall at all times maintain adequate and accurate books and records of all transactions entered into by it pursuant to this Title II and such records will be in such manner and form as will adequately show the costs to the Contractor with respect to each such transaction. The Contracting Officer, or his duly authorized representative, shall, at all reasonable times, have the right to examine, or audit or otherwise satisfy himself as to the correctness of purchase orders, records, invoices, time records or other records upon which the Contractor's claims for payment are based for replacement parts, materials and services reimbursable under this Title II. All such records shall be preserved by the Contractor for a period of three (3) years after the date of completion or termination of this contract. The Contractor agrees to maintain its books and records in a manner satisfactory to the Contracting Officer."

▮ The obvious reason why the books and records should be open to inspection and kept in a manner satisfactory to the contracting officer is that the Government could not be expected to reimburse plaintiff until plaintiff had paid out something. Since the records were in a confused state, the Government was perfectly correct in demanding that plaintiff bring its records into a current status and maintain them in accordance with recognized practices as required by Title II–G of the contract. Consequently, any delay resulting from the inadequacy of the records was due to the fault and negligence of the plaintiff.

Plaintiff now contends that it relied upon Government Manual TM 14–1000 and that 90 days represented a reasonable time for clearance of checks for payment under reimbursement vouchers instead of the 30-day period fixed by the Army Audit Agency.

Defendant contends that TM 14–1000 was only intended for use by the Audit Agency and was not something upon which plaintiff could rely.

However, assuming that TM 14–1000 does apply, section II thereof provides:

"Section II. Reimbursement Policies

"13. Reimbursement of costs

"a. It is intended that the contractor be reimbursed promptly and thus be enabled to regain his capital for use in further production. Prompt reimbursement also minimizes the need of the contractor for advances from the Government.

"b. For the purpose of reimbursement costs normally will be considered as expended when—in the case of direct charges *the cash has been paid out or the bank check drawn and placed in the mail* and, in the case of overhead when the amounts of the liabilities for the items included therein have been definitely established or are based on reasonably accurate accruals. When adjustments in the amounts of the liabilities are developed in subsequent periods, the refunds or additional charges involved should be prorated on the same basis as the original charges if the net amount of the effect of the contract is material. [Italics supplied.]

"c. As outlined in the sections dealing with overhead, monthly progress payments may be made for overhead on a tentative basis. These progress payments should be sufficiently less than the estimated overhead applicable to the contract to provide a suitable margin of safety. They do not constitute a reimbursement of costs but are advance payments against final overhead claims which will be presented by the contractor as a basis for the settlement of overhead. Care should be taken to avoid an excessive 'hold back' of overhead during the year which would unnecessarily increase the contractor's capital requirements.

"d. The total current reimbursements to the prime contractor are to be controlled by the auditor to avoid exceeding the maximum total cost stated in the prime contract and amendments. If it becomes apparent to the auditor that the prime contract will so exceed, he will notify the contracting officer. In the case of a CPFF subcontract, the auditor at the subcontractor's plant will notify his contracting officer and the auditor at the prime contractor's plant in any instance in which it becomes apparent that an overrun will occur on the subcontract.

"e. Contractors, engaged either solely on CPFF work or on CPFF and other work, may be reimbursed for pay rolls on a gross basis in respect to deductions for social security taxes, victory tax, and all other pay roll deductions. However, in respect to deductions for bonds, the amounts deducted must be currently deposited in a special bank account to be used only for bond purposes.

"f. A period of 90 days will be allowed for clearance of checks covering reimbursed direct charges as defined in paragraph 28 and deduction will then be made for any uncleared checks. Such deduction will not, however, include amounts covering taxes and bonds previously deducted from pay roll payments."

■ In this case, plaintiff's comptroller withheld checks totaling large amounts. Thus in these circumstances plaintiff was not eligible for reimbursement even under the 90-day provision contained in section II, paragraph 13f.

Defendant very strenuously argues that in any event plaintiff cannot recover for two additional reasons: (1) If the Government is responsible for delays in payment due to plaintiff, the measure of plaintiff's damage is the sum withheld plus interest. Defendant then correctly states that the Government is not liable for interest unless called for in the contract or governing statute; (2) The damages claimed by plaintiff by reason of the "forced sale" of its automobile agency were not foreseeable at the time the parties entered the contract. However, in the light of our holding that the delays in respect to this claim were due to the fault of plaintiff, it is unnecessary to decide this point. Count three of plaintiff's petition will be dismissed.

Count four is a claim for increased costs to plaintiff by reason of the failure of the defendant to inspect facilities within a reasonable time, which had been procured and installed on behalf of the defendant, under a facilities contract, for use in rebuilding the 750 GAA engines, thereby delaying the reimbursement to plaintiff for its costs in acquiring and installing such facilities.

In respect to the above claim, the record discloses that all the necessary facilities were procured by plaintiff. Most of the facilities acquired by plaintiff for the account of defendant were acquired and installed by the end of March 1952, and were substantially all acquired by the middle of June 1952. Final inspection and acceptance of the facilities and equipment was made in February 1953.

The commissioner has found that "had inspection and acceptance of all necessary tools and facilities been made promptly, plaintiff would have been reimbursed for substantially all of its facilities cost by

July 15, 1952. The carrying charges thereafter for unpaid balances at the rate of five percent per annum to the dates of payment, * * *, would amount to $8,025."

 Plaintiff points out that rather than "carrying charges" the damages sought are for delay in inspection. Consequently, plaintiff now asks permission to amend its petition to indicate the nature of the damages sought as that for rental and plant protection expense rather than the carrying charges as heretofore alleged. We find no objection to this amendment by defendant and since no further proof is necessary or indicated, permission is granted and we will treat the petition as being so amended.

In this posture of the case, the facts show that there was considerable delay in the inspection. As a result thereof, plaintiff was required to maintain the facilities in a condition for defendant's inspection and was unable to otherwise use it during this time after the contract had been performed and each engine delivered. The record reveals that plaintiff was required to pay rent on the premises where the idle facilities were installed at the rate of $2,920 per month, or a total of $11,680 from November 1 through February 28. However, $2,020 of those costs were paid, leaving a total sum of $9,659 which plaintiff paid as rent for this period.[2]

We can find no reason or excuse for the Government in not promptly inspecting the facilities. The facilities were no longer needed after October 31, 1952, when the rebuilding operations were completed. The Government had from July 15 to October 31 to make inspection, and we think this period of time was not only ample but generous. Since the final inspection was delayed until February 1953, we hold that plaintiff is entitled to recover the approximate amount paid as rent in order to maintain

facilities pending inspection. Plaintiff is therefore entitled to recover $8,232.94 on count four of its petition.

In conclusion, since plaintiff is not entitled to recover on counts two and three, its petition as to those counts will be dismissed. Plaintiff is entitled to recover on counts one and four in the amounts set forth above, and judgment will be entered for plaintiff in the sum of $95,820.

It is so ordered.

JONES, Chief Judge, and DURFEE, MADDEN and WHITAKER, Judges, concur.

---

2. The commissioner has found the amount to be $8,232.94, characterized as "carrying charges". Plaintiff does not except to this figure inasmuch as it is substantially the amount claimed.