**Travis T. WOMACK, Jr. and John R. Vorhies, Formerly Partners of Petroleum Ownership Map Company (a Dissolved Partnership)**

**v.**

**The UNITED STATES.**

**No. 269-62.**

United States Court of Claims.
Jan. 19, 1968.

Scott P. Crampton, Washington, D. C., attorney of record, and Jules G. Korner III, Washington, D. C., for plaintiffs, Korner, Doyle, Worth & Crampton, Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on April 10, 1967. Exceptions to the commissioner's report were filed by the parties and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the commissioner's findings, opinion and recommended conclusion of law, with minor modifications, it hereby adopts the same as modified as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiffs are entitled to recover and judgment is entered for plaintiffs in the sum of $19,440.17.

Commissioner Willi's opinion, as modified by the court, is as follows:

In the early 1950's the Department of the Interior, through its Bureau of Land Management (BLM), initiated a study directed to a program for the comprehensive revision and modernization of the record system covering title and usage of Federal lands in 17 Western States, including Utah.

Plaintiffs, whose regular business was the preparation and sale of oil and gas maps for the petroleum industry, were generally aware of BLM's planned undertaking and were interested in participating in it as a private contractor. Accordingly, they maintained contact with BLM's Washington personnel throughout the preliminary study phase of the program. Their views and recommendations were solicited by and were furnished to BLM.

By 1955 the methods and procedures for this large and unique undertaking were settled upon.

It was decided that all phases of the project, except the initial one, would be performed by private concerns under contracts awarded and administered by BLM. A special staff was established by BLM to administer and coordinate the entire project. Mr. Earl Thomas, Associate Director of BLM, was the responsible head of the overall program. Mr. Everett Eynon, now deceased, as Manager of the so-called Records Improvement Project, supervised day-to-day operations and performance by private contractors. Mr. Harold K. Johnson served as Mr. Eynon's general assistant and performed inspection functions at contractors' premises as well. Mr. Fred W. Heine, an attorney versed in land law, had basic responsibility for drafting the supply contracts, including the contract in suit, let by BLM under the program.

During a period of approximately one year, from August 1955, BLM itself microfilmed all previously unfilmed title and usage source documents in its files and in the files of various other Government agencies. In all, some four million documents were microfilmed. Each roll of film negative contained approximately 1600 document images. For control purposes BLM assigned a number to each film roll and prepared an index showing the subject matter to which each roll related.

When the microfilming was finished, BLM awarded Recordak Corp. a contract to make 35 mm. positive celluloid prints of the negative rolls.

Next, a contract was let to the Filmsort Division of the Dexter Folder Company for cutting the positive print rolls into individual images and mounting them in the window area of aperture-type tabulating cards.

The next step in the project was the preparation of a so-called Control Document Index for each of the 17 States involved. This operation, performed by the York Tabulating Service under a

unit-price BLM contract [1] awarded October 13, 1955, consisted essentially of identification and sorting of the aperture cards. Specifically, York viewed each aperture card and key-punched into it the subject matter depicted in its film image. When that subject matter related to more than one township of the State to which the card pertained, a cross-reference-type tabulating card was prepared for each additional township involved. After these operations were completed, all cards were segregated by State and the cards for each State arranged according to meridian, township and range.

Because of York Tabulating's limited financial resources, BLM agreed to a partial-payment arrangement under which York was permitted to bill for cards in lots of approximately 100,000 after they had gone through the initial, or State sort. Each York billing gave a breakdown showing the number of cards that were involved for each State. BLM maintained a current record showing, by State, the cumulative total of cards for which it had been billed.

The final phase in the BLM project, and the one with which the contract in suit is concerned, involved basically a transposition of the information contained in the Control Document Index onto title and use status plats, with an accompanying historical index, that were to be prepared for each township of the State to which the Control Document Index pertained. In such an operation the amount of work involved in annotating the plats and compiling the historical indices varied directly with the number of cards in the Control Document Index for the State in question.

In May 1956, BLM advised the plaintiffs that the Records Improvement Project was progressing satisfactorily and that an invitation for bid on a contract to prepare the annotated plats and historical indices for either Utah or New Mexico, as the lead State in the program, would be issued within the following several weeks.

On August 14, 1956, John Vorhies telephoned BLM's Earl Thomas to inquire as to when the invitation for the Utah contract would be issued. After Mr. Thomas stated that the Utah invitation would be issued shortly, Vorhies asked how many cards there would be in the Utah Control Document Index. He explained that this information would be important for bidding purposes. After consulting briefly with his associates, Mr. Thomas stated that an approximation of the card quantity would be put in the invitation so that it would be made known to all interested bidders. Prior to this request from Mr. Vorhies, BLM had not intended to include any reference in its invitation to the size of the Control Document Index.

On August 17, 1956, at which time it had been billed for 58,691 Utah cards by York Tabulating, BLM issued the invitation for bids on the contract in suit.

The invitation, specifying an opening date of September 18, 1956, called for a fixed-price bid for the preparation of a master title plat, a use status plat and a historical index for each township in Utah, Oregon or both.[2] The specifications, referring to the Control Document Index, stated: "There are an estimated sixty-five thousand (65,000) mounted aperture and cross-reference cards for the State of Utah * * *." Additionally, the specifications provided that: "A standard diagram shall be used for the basic master title plat as is set forth in the detail information for an estimated eighty-five per centum (85%) of the townships for which the plats are prepared under this contract." Finally, the specifications included the following general provision: "All estimated quantities in this contract are subject to a

---

1. This contract, though not directly involved in the instant suit, was itself the subject of a proceeding before the Interior Board of Contract Appeals. York Tabulating Service, Inc., 58–1 BCA, par. 1635.

2. Although plaintiffs submitted bids for both Utah and Oregon, they were only awarded the contract for Utah.

twenty-five per centum (25%) increase or decrease." (Finding 18, infra.)

The estimate as to card quantity represented the best collective judgment of the members of BLM's Record Improvement Project staff. They based their judgment on the number of Utah cards for which York had billed (58,691) by the time that the invitation was issued and their impressions as to York's percentage of completion on Utah, gained from the bi-weekly inspection visits of BLM personnel to the York premises.

The estimate as to percentage of Utah townships that could be platted on standard diagrams was based on the judgment of Mr. Earl Harrington, Chief of BLM's Division of Cadastral Engineering. Mr. Harrington was a man of 50 years' professional experience and unquestioned competence. In arriving at his standard diagram estimate for Utah, he reviewed 800 plats from locations throughout the State.

The invitation advised interested bidders that a BLM representative would be in Salt Lake City during the week of August 27 to discuss the proposed contract and answer questions. The representative was Mr. Fred Heine, and Travis Womack met with him at the appointed time and place. At their meeting Womack asked why BLM could not be specific as to the number of Utah cards. Mr. Heine explained that use of an estimate was unavoidable because York Tabulating had not completed the Control Document Index for Utah. He added that BLM felt that its estimate was entirely sound and that, while not completely through, York was very close to being finished with Utah. During his stay in Salt Lake City, Womack examined a sufficient number of plats at the Land Office to satisfy himself that BLM was correct in estimating that 85 percent of the Utah townships could be platted on standard diagrams.

Following the Salt Lake City meeting with Mr. Heine, plaintiffs went to work on the formulation of their bid. Among the things that they did to arrive at a bid price for Utah was a time study on the preparation of a historical index and plat annotations for what they deemed a representative 35-section township. The historical index and the plats for such an average township, plaintiffs assumed, would each have 25 information entries; one entry for each of 25 cards from the Control Document Index. This assumption of card quantity per township was derived by dividing the estimated total quantity of 65,000 index cards by the total number of townships in Utah—approximately 2,550 according to the invitation for bid.

Plaintiffs submitted their bid to BLM on September 15, 1956, with the express stipulation that it was subject to acceptance by the Government within seven days of bid-opening, September 18, 1956. As previously noted, the bid contained separate fixed-price proposals for both Utah and Oregon.

At the opening, it developed that plaintiffs' bid for the State of Utah was second-low. The low bidder was the firm of Bush and Fogel of Salt Lake City. Within a day or two of being notified of the results of the bidding, that firm asked to be relieved of its bid.

Almost immediately after the opening, plaintiffs learned that they had been slightly underbid for the Utah job. They did not know of the low bidder's desire to be relieved, but they felt that they should be awarded the Utah work in any event because the total of their bid prices for both Utah and Oregon was low. On September 21, 1956, John Vorhies came to Washington to persuade BLM that plaintiffs should be awarded the entire contract. On that day and the day following he conferred with Messrs. Thomas, Eynon, Johnson and Heine.

In the course of the conferences, Mr. Thomas advised Vorhies of the low bidder's request to be relieved of its bid and asked whether plaintiffs would be willing to grant the Government an additional 10 days within which it could accept their bid for Utah. Because of appropriations and other considerations of timing, BLM was anxious to avoid setting aside all bids and readvertising

the contract for Utah. During the discussions relating to BLM's requested time extension, Mr. Vorhies asked precisely how many cards were involved in the Control Document Index for Utah. The BLM representatives advised him that as of that time York had billed for 64,604 Utah cards. They stated that although a few more cards might be forthcoming, York had finished with its work on Utah for all practical purposes. This expression, which Mr. Vorhies had no reason to question, represented the honest judgment and belief of the BLM representatives at the time, and Mr. Vorhies relied on its accuracy in giving BLM a written agreement to the requested extension of time. In fact, the BLM personnel expressed gratification that their earlier estimate of 65,000 Utah cards had proved so accurate.

On September 25, 1956, BLM's Harold Johnson made one of his periodic inspection visits to York Tabulating. On this particular occasion he went for the primary purpose of determining when York would be finally finished with the Utah Control Document Index. He, of course, knew that BLM had already been billed for 64,604 Utah cards. He also knew that, under York's procedures, billings were submitted on the basis of card count after the initial sort of aperture cards by State and prior to the subsequent sorts that were done to arrange the cards in required sequence by meridian, township and range. Mr. Johnson asked York's president about the status of the Utah cards and was advised by him that all such cards had been through the initial sort by State and that approximately 13 working hours of sorting would be required to place the cards in final sequence. Johnson accepted this representation without further questioning and without consulting any of York's various production records with which he was familiar and which were readily available to him for inspection. He let the matter rest even though he could not understand why, if only 13 hours of sorting work remained, York could not specify a firm date for completion and shipment of the index, and even though

this information was the prime objective of his visit.

On September 28, 1956, BLM awarded the contract for Utah to plaintiffs. On that same date, York billed BLM for an additional 16,244 Utah cards. When BLM received this billing in the ordinary course of the mails, all members of the Records Improvement Project were completely surprised because they had all felt certain that York's September 13 billing, bringing the total of Utah cards to 64,604, was its final billing of any consequence so far as card quantity was concerned. In fact, York billed BLM for significant quantities of Utah cards in both October and December 1956. Ultimately, the Utah Control Document Index numbered 105,000 cards.

In addition to the substantial overrun of Control Document Index cards encountered by plaintiffs in the course of performance of their contract, it developed that instead of having to draw special plats for only 15 percent of the Utah townships, as estimated in the invitation for bid, it was necessary to do this special work for approximately 45 percent of the townships in order to meet contract requirements respecting diagramming. Thus, instead of the projected 383 irregular townships, there were actually 1,148 requiring special diagramming.

On March 5, 1957, Change Order No. 2 to the subject contract was executed by the parties. It allowed plaintiffs additional compensation on account of both the excessive size of the Control Document Index and the inordinate number of irregular townships. In each instance plaintiffs were compensated at an agreed rate for the excess over the estimated quantities plus 25 percent. Respecting the cards, they were paid for the excess over 81,250 (65,000 plus 25 percent of 65,000). As to the irregular townships, they were paid for the excess over 479 (383 plus 25 percent of 383).

The parties have agreed that for purposes of this suit, by which plaintiffs seek compensation for the extra work represented by the first 25 percent of

excess over the contract estimates, if plaintiffs are entitled to recover on the additional card issue, the amount of that recovery should be $19,440.17. Similarly, should they be found entitled to recover on the irregular township issue, it is agreed that the recovery should be $2,391.86.

Plaintiffs seasonably filed a claim with the Contracting Officer for the amounts sought in the present suit. After he denied the claim, they appealed to the Interior Board of Contract Appeals. Plaintiffs' principal position before the Board was essentially as it is here; that prior to award of the contract the Government possessed sufficient information to put it on notice that the estimates set forth in the invitation for bid were erroneous. The Board denied the appeal, holding that even if plaintiffs' factual contentions were accepted they made out no more than a basis for relief by way of rescission or damages for breach—relief beyond the Board's jurisdiction. Petroleum Ownership Map Co., 58–1 BCA, par. 1755.

Although the defendant denies liability on both claims in suit, it does not deny that the amount of plaintiffs' work was directly affected by the quantities of both index cards and irregular townships. In awarding additional compensation under Change Order No. 2, defendant recognized this fact. Accordingly, the materiality of the quantities estimated in the invitation for bid is not disputed.

Plaintiffs contend that they should recover on the card issue because, on the basis of information in its possession or readily and singularly available to it when it awarded the contract in suit, the Government knew or reasonably should have known that its estimate of 65,000 index cards was so seriously in error as to constitute a misrepresentation amounting to a breach of contract.

Defendant's position is that it should not be held liable because it seasonably disclosed to the plaintiffs everything that it actually knew about the quantities of Utah cards, and because it was not until after the award that it knew as a matter of fact that its estimate was significantly wrong. In these circumstances, defendant says, the 25 percent variance in quantity clause contained in the contract operates to place the risk of the first 25 percent of card overrun on the plaintiffs as a matter of law. Because of the general variance in quantity clause there can be no recovery, according to defendant, unless it is found that at the time of the award it actually knew that there would be more than 81,250 Utah cards (65,000 plus 25 percent thereof) and deliberately withheld that information from the plaintiffs. In essence, defendant is saying that the variance in quantity clause has the effect of converting the 65,000 estimate to an estimate of 81,250.

Defendant's position is incorrect both as to the requirement of scienter in establishing an actionable misrepresentation for breach of contract purposes and as to the legal impact on an estimate of a general variance in quantity clause.

While the evidence supports the defendant's claim as to the extent of its actual knowledge and its timely disclosure of that knowledge to the plaintiffs, it also shows that an exercise of reasonable care would have alerted it, at least by the time of award of the contract, to the substantial incorrectness of its unquestionably honest but equally erroneous impressions concerning the highly relevant matter of card quantity.

The evidence as to additional relevant information reasonably available to the Government is substantial.

Mr. Harold Johnson, Assistant Manager of BLM's Records Improvement Project, acknowledged at the trial that an analysis of the film roll index established and maintained by BLM in Washington would have enabled it to project at least the minimum number of index cards that would be required for the State of Utah. This was never done even though BLM was genuinely interested in ascertaining the number of cards that would likely be involved.

More significant was Mr. Johnson's visit to the York premises on September

25, 1956. His primary purpose in making the trip was to expedite completion and shipment of the Utah index. He went with the knowledge that as of September 13, 1956, BLM had been billed for 64,604 Utah cards and with the impression that this figure represented substantially all of such cards. He also knew that the bids for the final phase of the Utah work had been opened on September 18, 1956; that the low bidder had sought leave to withdraw; and that in the course of Washington meetings on September 21 and 22, 1956, BLM had requested John Vorhies to extend the acceptance time for plaintiffs' bid. Finally, he knew from personal observation that during those meetings Vorhies inquired as to the total number of Utah cards and was told by members of the Records Improvement Project that the final number would closely approximate the previously estimated figure of 65,000.

Thus informed, Mr. Johnson asked York's president, Milan Bump, about a firm completion date for the Utah index. Although Bump told him that all Utah cards had been sorted by State, meridian and quadrant and that only 13 hours would be required to complete the final sorting, he would not specify a date for completion prior to October 5, 1956. Even though Johnson was at a loss to understand why it would take from September 25 to October 5 to perform 13 hours of sorting work, he made no effort to verify Bump's statement as to the current condition of the Utah cards by consulting any of the several York production records with which he was familiar and which were freely available to him. Had he examined these records, it would have been apparent to him that all Utah cards had not, in fact, been sorted by State, meridian and quadrant. Furthermore, at no time during this visit did Johnson ask Bump about the total number of Utah cards that might be anticipated or whether the bills already received by BLM, through September 13, covered substantially all of such cards.

▬ Considering the purpose of the inspection visit and the background of

events, information and assumptions against which it was made, it must be said that Mr. Johnson's total failure to consult York's production records or to even inquire of Mr. Bump as to total card quantity constituted negligence on BLM's part. Thus, the information that was there for the asking but not sought is to be imputed to BLM in determining whether, at the subsequent time of the award to plaintiffs, the 65,000 card estimate constituted a material misrepresentation. Considering all of the circumstances, it constituted such a misrepresentation and not the less so because it was attributable to defendant's negligence rather than to any conscious attempt to deceive the plaintiffs. Whatever the case in tort or other areas, intent to mislead is not an essential element of actionable misrepresentation in the breach of contract context. Morrison-Knudsen Co. v. United States, 345 F.2d 535, 539, 170 Ct.Cl. 712, 719 (1965). An inadvertent misrepresentation stemming from negligence is fully as damaging as a deliberate one to the party who relies on it to his detriment. Notably, the victim of a misrepresentation amounting to a breach of contract is made whole by compensatory, not punitive damages.

The unqualified and mechanical application of the 25 percent variance in quantity clause to the card estimate clause, as urged by defendant, fails to accord the two provisions meanings which permit them to function in a complementary manner. Under defendant's view, the general clause serves to make all deviations from the estimate, however occasioned, and however foreseeable, noncompensable so long as the deviation does not exceed 25 percent on either side of the estimate.

▬ We are dealing with two separate provisions of a single contract, one specific and one general. Under familiar principles, the interpretation that accords a reasonable meaning to each of the provisions is to be preferred. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965).

■■ An estimate as to a material matter in a bidding invitation is an expedient. Ordinarily it is only used where there is a recognized need for guidance to bidders on a particular point but specific information is not reasonably available. H. L. Yoh Co. v. United States, 288 F.2d 493, 494, 153 Ct.Cl. 104, 105 (1961). Intrinsically, the estimate that is made in such circumstances must be the product of such relevant underlying information as is available to the author of the invitation. If the bidder were not entitled to so regard it, its inclusion in the invitation would be surplusage at best or deception at worst. Assuming that the bidder acts reasonably,[3] he is entitled to rely on Government estimates as representing honest and informed conclusions. Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 909–910, 154 Ct.Cl. 476, 479 (1961). In short, in promulgating an estimate for bidding-invitation purposes, the Government is not required to be clairvoyant but it is obliged to base that estimate on all relevant information that is reasonably available to it.

■ By adding a general variance in quantity provision to a bidding invitation for a fixed-price contract, the Government does not dilute the standard to which it is held with respect to particular estimates that it includes elsewhere in the invitation. In conjunction with an estimate, the proper office of such a general clause is to afford a flexibility sufficient to accommodate actual deviations from the estimate that are not reasonably predictable at the time that the estimate is made and during the time that it remains subject to reliance by the bidder. It embraces variations that are attributable to facts that are not among those reasonably available to the estimator. The latitude that it affords may not properly be used to excuse the estimator from using and disclosing relevant information that is reasonably available to him. Thus, it may be said that its role is to preserve the stability of a fixed-price contract despite fortuitous departures, up or down, from the estimated amount of work to be done.

■ In summary, the defendant overreaches when it says that the variance in quantity clause, within its percentage limits, put the risk of an index card overrun, whatever its cause and foreseeability, on the plaintiffs. Specifically, the clause apportions only a particular type of risk to the parties, the risk of an excess or shortage resulting from factors not reasonably apparent to them at the time that they entered into their contract. The clause does not require one party to bear the first 25 percent of the burden of the other party's negligence.

The irregular township issue well illustrates a proper application of the general variance in quantity clause.

■ The Government estimated in its invitation that 85 percent of the Utah townships could be platted on a standard diagram. The estimate was made by a respected and experienced cadastral engineer after reviewing 800 plats from locations throughout the State of Utah.

Prior to bidding, Travis Womack went to the Salt Lake City Land Office and reviewed a sufficient number of Utah plats to convince him that the Government's estimate respecting standard diagramming was accurate.

When plaintiffs performed their contract, they found that by applying criteria that were agreeable to both themselves and BLM,[4] only 55 percent of the Utah townships could be platted on the less costly standard diagrams.

In support of their claim, plaintiffs argue only that the Government's estimate should be deemed a misrepresentation because it ultimately proved to be so wide of the mark. The contention is without merit because error *per se* is not misrepresentation.

---

3. Russell & Pugh Lumber Co. v. United States, 290 F.2d 938, 941, 154 Ct.Cl. 122, 127 (1961).

4. Finding 31, infra.

The evidence shows that both parties exercised reasonable care and diligence in arriving at and testing the accuracy of the 85 percent estimate. It was only the actual experience of performing the contract that demonstrated that they were both badly mistaken in their forecasts. When they entered into their contract, both parties knew that the actual total number of regular townships could not feasibly be determined in advance of performance. In these circumstances, the variance in quantity clause put the risk of the first 25 percent of low-side forecasting error on the plaintiffs. The Government had informed them as best it reasonably could for bidding purposes, and they had confirmed its estimation by their own investigation. Though both parties were substantially mistaken as a matter of fact, the plaintiffs are not entitled to the equitable relief of reformation because their contract cast on them the risk of just such a contingency. 3 Corbin, Contracts § 598, at 585–586 (1960). Plaintiffs have failed to show any change in the requirements, in this respect, during performance of the contract.