ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Burnham Associates, Inc. ) ASBCA No. 60780
)
Under Contract No. W912WJ-12-C-0009 )

APPEARANCE FOR THE APPELLANT: John D. Fitzpatrick, Esq.
Pingitore & Fitzpatrick, LLC
Cambridge, MA

APPEARANCES FOR THE GOVERNMENT: Thomas J. Warren, Esq.
Acting Engineer Chief Trial Attorney
Theresa A. Negron, Esq.
Engineer Trial Attorney
U.S. Army Engineer District, New England

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

This appeal arises from a contract to perform dredging in Boston Harbor. Burnham Associates, Inc. (Burnham) submitted a certified claim seeking additional money on two issues: $334,464 due to the government's use of a previously undisclosed pre-dredge survey to calculate final quantities; and $70,144.94 due to delays caused by shipping traffic in the harbor. The parties have both filed motions for summary judgment and briefs supporting their respective positions. Upon discussion with the Board regarding whether material facts were in dispute, the parties agreed to submit this appeal on the written record under Board Rule 11. The Board allowed the parties to file supplemental briefs, Rule 4 supplements, or declarations. Only entitlement is before us. We sustain the appeal as to the pre-dredge survey but deny it with respect to the shipping traffic delays.

FINDINGS OF FACT

1. On 16 May 2012, the U.S. Army Corps of Engineers, New England District, (Corps or USACE) issued a solicitation for a project entitled "Rock Removal, Boston Harbor Boston, Massachusetts" (R4, tab 6 at 1). The contract subsequently incorporated the solicitation (R4, tab 12 at 2).

Pre-Dredge Surveys

2. The Geotechnical Data section of the solicitation stated that a USACE contractor had conducted "a bathymetric, geophysical and geotechnical investigation of areas shown in the contract drawings from May-June 2010" (R4, tab 6 at 37). Somewhat

confusingly, however, the drawings indicated that they were based upon a hydrographic survey conducted in March 2011 (*id.* at 170-71).

3. The Summary of Work section stated that seven areas of rock had been identified "during the recent subsurface investigations of Boston Harbor" and that there were about 525 cubic yards of material to be removed (R4, tab 6 at 43).

4. The Measurement and Payment section of the solicitation provided that USACE would pay contract line item number (CLIN) 0002 (dredging and disposal of rock) "by computing the volume between the bottom surface shown by soundings of the last pre-dredge survey made before dredging begins and the bottom surface shown by the soundings of a post-dredge survey made as soon as practicable after the removal of the material" (R4, tab 6 at 50). The solicitation provided that the contractor would not be paid for material dredged outside the defined areas (*id.* at 152); it refers to the material eligible for payment as the "payable quantity" (*id.* at 127).

5. Depths in areas that have been dredged can change over time due to currents, ship traffic stirring up the bottom, large tide fluctuations, and/or weather (R4, tab 38, ¶ 2 (supp. Preston decl.)). As a result, the Corps generally conducts a pre-dredge survey within six months of the start of dredging (*id.* ¶ 12). Consistent with this practice, the solicitation stated that another pre-dredge survey "may be performed by the Government prior to the start of Contractor dredging operations at the dredging sites" (R4, tab 6 at 43-44). However, the Corps opted not to conduct a pre-award/pre-dredging commencement survey (R4, tabs 9-10).

6. While the bidders only knew about the March 2011 and earlier surveys, the Corps had, in fact, conducted a survey within the six-month pre-dredge window when it issued the solicitation, namely, a hydrographic survey of the harbor conducted on 12, 14 and 15 March 2012 (R4, tabs 4, 30). The Corps conducted this survey in response to a request from the Massachusetts Port Authority (Massport), which was aware of the incomplete rock removal in the federally-maintained portion of the harbor channel and was concerned that it might affect a tall ships/War of 1812 bicentennial event planned that summer. Because the Corps conducted this survey in response to the request by Massport, it did not at that time calculate volumes of material that could be dredged. (R4, tabs 3-5, 35 (Preston decl.) ¶ 5, supp. Preston decl. ¶ 13)

7. According to a declaration submitted by Jeffrey W. Preston, a Corps official who at the time was engineering technical/crew chief, after the Corps performed the March 2012 survey, a team of Corps employees "edited the data over the next month and a half" (Preston decl. ¶ 3). The Corps had used new equipment on this latest survey so Mr. Preston decided to perform what he referred to in his initial declaration as a "cross check" with the results of the March 2011 survey by examining the highest pinnacle of the rock outcrops. He found the results of the two surveys to be similar. (*Id.*) In his supplemental declaration, Mr. Preston clarified that his comparison of the two surveys

2

was a "quick map check" that "is in no way a reflection on the quantity of volume available since it is only checking the individual peaks...on the harbor bottom" (supp. Preston decl. ¶ 14).

8. While the record is clear up to this point, the question of "what did the Corps know and when did it know it?" becomes less clear as we draw closer to the 16 July 2012 award date of the contract. In a motion for summary judgment filed in May 2017, the government stated that in June 2012 it used the March 2012 survey as the pre-dredge survey to calculate that there were only about 430 cubic yards of payable quantity (gov't MSJ br. at 4, ¶ 17 (citing R4, tabs 9-10), at 8, ¶ 31 (citing R4, tab 20)). None of the documents cited by the Corps, however, actually show that it performed this calculation in June 2012.

9. In the government's most recent brief (Rule 11 brief), the government now states that it did not perform the revised calculation of payable quantity until 8 August 2012 (that is, 23 days *after* contract award) (gov't R11 br. at 10 (citing R4, tabs 30, 38)). In support of this revised assertion, the Corps cites testimony from Mr. Preston who relies on Rule 4, tab 30 (supp. Preston decl. ¶ 23). However, tab 30 is a summary table that does not specify the date on which the Corps calculated the reduced quantity estimate.

10. According to Mr. Preston, surveys are conducted with modern depth sensors (called multibeam sonar) which enable the surveyor to obtain raw depths, which are recorded. For this data to become useful, erroneous depths caused by fish or bubbles from a boat engine must be removed. The edited data can be broken down by laying a grid over the work area, which for the 2011 survey was an area of one foot by one foot. The Corps normally saves two types of electronic files as a result of this process: one provides the minimum depth in each grid square, while the other provides the average depth. (Supp. Preston decl. ¶¶ 4-9)

11. To calculate volumes of material to be dredged, the Corps uses software called MicroStation to create a template representing the desired dredge depth. In the case of the March 2011 survey, it then compared the 1' x 1' minimum depth grid squares to the template. The software determines how many cubic yards of material must be dredged to bring the area down to the desired depth. (Supp. Preston decl. ¶¶ 10-11)

12. Although it is not entirely clear, we find with respect to the 2012 survey that the Corps performed the survey, edited the survey data and created the minimum depth grid squares in the March-April 2012 time period and that it calculated the estimated volume of material to be dredged on 8 August 2012 (*compare* Preston decl. ¶ 3 ("After the survey was completed and data was collected, my team edited the data over the next month and a half") *with* supp. Preston decl. ¶ 13 ("No volumes were calculated immediately after the survey"), ¶ 23 ("On August 8, 2012, available volume for the 2012 government pre-dredge survey was calculated by the Corps.")). Thus, although Mr. Preston's declaration contradicts the Corps' earlier position that it performed the

3

calculations in June 2012 and is not supported by any contemporaneous evidence, this is the only evidence we have. We accept his sworn testimony that the Corps calculated the quantities on 8 August 2012.

13. The Corps did not disclose in the solicitation that it had performed an additional survey in March 2012 from which it had collected minimum depths that could be used to calculate payable quantity. Burnham and/or its subcontractors were capable of calculating volumes of material using the survey data. (Burnham decl. ¶ 3; R4, tab 37)

14. Burnham submitted the low bid on 28 June 2012. The parties thereafter entered into a contract with an award date of 16 July 2012. (R4, tab 12 at 2, tab 11)

15. The contract incorporated various Federal Acquisition Regulation (FAR) clauses, including FAR 52.211-18, VARIATION IN ESTIMATED QUANTITY (APR 1984) (R4, tab 12 at 5) which provided in part as follows:

> If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity.

In addition, the contract contained EFARS 52.211-5001, VARIATIONS IN ESTIMATED QUANTITIES–SUBDIVIDED ITEMS (MAR 1995) (*id.* at 17).

16. Burnham performed the contract work from August to October 2012 (R4, tab 24). The Corps conducted a post-dredge survey on 4 and 11 October 2012 (R4, tab 30).

17. The post-dredge survey showed that 15.9 cubic yards of payable material remained at the site. If the Corps had used its March 2011 estimate, as adjusted down slightly to 522 cubic yards of material, Burnham would have been entitled to payment for 506.1 cubic yards. However, the Corps used the March 2012 survey showing 429.9 cubic yards to calculate that Burnham was entitled to payment for 414 cubic yards. (R4, tab 30; 2nd supp. Burnham decl. ¶¶ 6-7)

18. Dredging contracts often require removal of tens of thousands of cubic yards of material, and sometimes millions (2nd supp. Burnham decl. ¶ 6; R4, tab 14 at 12). Because this project contained a small amount of payable material but was labor intensive (requiring Burnham, among other things, to reduce the rock to rubble with high explosives), Burnham bid the project at $3,375/cubic yard (CY) for the first

4

150 CY of payable quantity (CLIN 0002AA) and $3,000/CY for material over 150 CY (CLIN 0002AB) (2nd supp. Burnham decl. ¶¶ 5-6; R4, tab 13 at 4). While Burnham ultimately had to remove more than 1,500 cubic yards of material, mostly submerged rock, to complete the contract, this pricing structure left it vulnerable to a significant reduction in the quantity of payable material (2nd supp. Burnham decl. ¶ 6).

19. Burnham submitted a certified claim dated 25 November 2014 to the contracting officer (R4, tab 32). Burnham contended, among other things, that the Corps had misrepresented the payable quantity (*id.* at 1).

20. The contracting officer issued a final decision denying the claim on 9 June 2016 (R4, tab 2). She contended that the differences between the 2011 and 2012 surveys "were likely due to differing amounts in soft material present in the areas where work was to be conducted" because the "volume of rock would not have changed" (*id.* at 12).

21. Despite this statement in the contracting officer's final decision, the contract drawings provided that "for payment purposes it is assumed all material removed within limits of dredging is rock" (R4, tab 6 at 172-75 n.1). Burnham's experience confirmed this. It found little to no other material such as sand or silt in the dredging area (supp. Burnham decl. ¶ 5; 2nd supp. Burnham decl. ¶ 6; *see also* supp. Preston decl. ¶ 6 (an earlier contractor stated that it could not dig in the dredging areas because they were "hard rock or ledge")).

Shipping Traffic

22. The solicitation/contract contained the following clause warning bidders that there are other boats in Boston Harbor that would need some accommodation:

> 1.3 PROJECT/SITE CONDITIONS
>
> 1.3.1 Physical Data
>
> ....
>
> e. Channel Traffic: Boston Harbor and the adjacent areas to be dredged are mainly used by deep draft commercial vessels, fishing vessels, and numerous small recreation and commercial craft, which may cause some interference with contract operations. Certain restrictions on vessel movement are in place when liquid natural gas (LNG) tankers traverse the harbor. The Contractor will be required to conduct the work in such a manner as to obstruct navigation as little as possible, and in the event the Contractor's plant so obstructs the channel as to make

difficult or endanger the passage of any vessels, the plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage. Moving of dredging plant may also be based on the determination of the docking pilot if vessel traffic requires it.

(R4, tab 6 at 43-44)

23. In Burnham's 25 November 2014 certified claim, it sought $79,233.35 for an alleged interference in its work by commercial ships and pleasure craft. It later lowered this amount to $70,144.95. (R4, tab 36 at 3) While Burnham appears to complain generally about disruptions to its work throughout the contract term caused by these commercial ships and pleasure craft, as well as restrictions imposed by the Coast Guard, we will confine our discussion to the days for which Burnham seeks damages (*see* R4, tab 32 at 15, tab 36 at 3).

24. Burnham contends it suffered one-half day of delay on each of the following dates (R4, tab 36 at 3). On 23 August 2012, Burnham's daily report states that it waited from 7:30 a.m. to 1:00 p.m. for commercial ship traffic to clear out of the work area. On the following day, it was unable to work after 11:45 a.m. due to commercial shipping (R4, tab 24 at 9, 11). On 25 and 30 August 2012, Burnham's daily reports states that there are "[o]ngoing issues with pleasure craft approaching dredge at high speeds and causing wakes" (*id.* at 13, 22). On 7 September 2012, Burnham's daily report does not identify any delays caused by other boats; instead, it states that Burnham canceled a blast due to trouble with its own electronics (*id.* at 32).

25. From 1-3 September 2012, Burnham contends that it was unable to work due to increased pleasure boat traffic in the harbor[1] (R4, tab 24 at 25-27). But Burnham's pre-construction schedule shows that it did not plan to work on 2 and 3 September – the Sunday and Monday of Labor Day weekend (R4, tab 17 at 5).

26. Burnham contends that its work was often impacted by curious recreational boaters who sped close to its barge, creating a wake that rocked the barge (app. br. at 7). Mr. Burnham testified that the harbor was "often bedlam on Sundays" because of these boats (supp. Burnham decl. ¶ 8).

27. Burnham's daily reports for 14-16 and 20 September 2012 state that it did not perform any work on those dates "due to ship traffic," with the 16 September report also mentioning work restrictions (R4, tab 24 at 44-46, 50).

---

[1] Burnham eliminated its damage claim for these three dates in its revised submission to the contracting officer (R4, tab 36 at 3) but they reappear in its briefing to the Board.

28. Burnham has provided some evidence with respect to the level of commercial shipping in the harbor. Citing an email from Andy Hammond, Executive Director of the Boston Harbor Pilot Association dated 22 August 2012, Burnham identifies three commercial ships that were scheduled to be in the harbor on 23 August and seven on 24 August (*see* R4, tab 32-41). It also cites one of its own emails on 23 August to state that the *U.S.S. Constitution* was scheduled to be in the harbor on 24 August (R4, tab 32-42). An email from Mr. Hammond identifies five ships scheduled to be in the harbor on 30 August (R4, tab 32-47).

29. Burnham has also submitted a 5 September 2012 email from a Massport official that attached the cruise ship schedule for the period 31 August to 1 November 2012 (R4, tab 32-49). For the dates on which Burnham has claimed it suffered a delay, the email reflects one cruise ship scheduled to be in the harbor on 1, 7, 15, 16, and 20 September, and two cruise ships on 14 September 2012 (*id.* at 3).

30. Neither party has provided us with any evidence that indicates how the level of recreational boaters, commercial shipping, cruise ship traffic or Coast Guard restrictions compares to historic levels in the harbor (although the Corps refers us to the Massport website, which states that the Conley Terminal, the full service container terminal, handles about 1.5 million metric tons of cargo per year). Accordingly, we find that Burnham has not proven that traffic in the harbor was above average while it performed its contract work, nor has it proved that the Coast Guard caused any quantifiable delay.

## DECISION

*Dredging Survey*

In Burnham's certified claim, it sought to reform the contract by repricing CLIN 0002 based on the quantities from the March 2012 survey. Thus, its price for CLIN 0002AA would increase from $3,375 to $4,135 and CLIN 0002AB would increase from $3,000 to $3,676. Using these numbers, Burnham would be entitled to an equitable adjustment of $334,464.[2] (R4, tab 32 at 14) However, in its briefing to the Board, Burnham states that it seeks to either reprice CLIN 0002 based on the March 2012 survey, or to be paid for 506 cubic yards at its bid prices (app. R11 br. at 3; 2nd supp. Burnham decl. ¶ 7).

The government is not required to be clairvoyant when it issues an estimate for bidding purposes, but a contractor can recover if it shows that the estimate was

---

[2] $4,135 x 150 cy = $620,250
$3,676 x 264 cy = $970,464
$620,250 + $970,464 = $1,590,714
$1,590,714 - $1,256,250 (the amount already paid) = $334,464

7

inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made. *Clearwater Forest Industries, Inc. v. United States*, 650 F.2d 386, 395 (Ct. Cl. 1981). Thus, to the extent that a government estimate is inadequately or negligently prepared, its inclusion without correction in a solicitation or contract constitutes a misrepresentation that, whether deliberate or not, amounts to a breach of contract. *Rumsfeld v. Applied Cos., Inc.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003) (citing *Womack v. United States*, 389 F.2d 793, 800 (Ct. Cl. 1968)). Even if the government's estimate is not drastically inaccurate, if it was prepared negligently or in bad faith the government is liable for breach. *American Gen'l Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,365.

In *Womack*, the Court of Claims observed that an inadvertent misrepresentation stemming from negligence is fully as damaging as a deliberate one to the party who relies upon it. *Womack*, 389 F.2d at 800. A bidder is entitled to rely on an estimate as representing honest and informed conclusions. *Id.* (citing *Lynch Motors, Inc. v. United States*, 292 F.2d 907, 909-10 (Ct. Cl. 1961)). The inclusion of a variance in quantity provision in the contract does not dilute the standard to which the government is held. Such clauses afford flexibility to accommodate actual deviations that are not reasonably predictable at the time the estimate is made and during the time that it remains subject to reliance by the bidder, embracing variations that are attributable to facts that are not among those reasonably available to the estimator. The variance in quantity clause does not excuse the estimator from using and disclosing relevant information that is reasonably available to him, nor does it require the contractor to bear the first 15% of the burden of the government's negligence. *Id.* at 801.

Based on the government's position in its May 2017 summary judgment brief — that it calculated the 430 cubic yards estimate in June 2012, the month prior to contract award — we would have no problem in concluding that the Corps was negligent in failing to provide the revised estimate to Burnham. The government's defense in that earlier brief seemed to focus on the fact that it did not have the lowered estimate when it issued the solicitation in May 2012 (gov't MSJ br. at 15). However, this would not have absolved the government of liability. The Court of Appeals for the Federal Circuit has held that if the government obtains new information between the time of solicitation and award it will be held liable for a misrepresentation if it does not disclose that information to the contractor. *Applied Cos.*, 325 F.3d at 1330-31, 1335.

The revised facts conveyed through the government's Rule 11 brief and the supplemental Preston declaration present a closer call because the government had not yet calculated the lowered quantity estimate at the time of award. But after carefully considering the facts and the legal test articulated in *Womack*, we hold that the government is liable for a misrepresentation. Under *Womack*, the government is required to base its estimate on all relevant information that is reasonably available to it. *Womack*, 389 F.2d at 801. The government failed to do that because it did not base its estimate on the most current survey from March 2012. Using a survey that was more than a year old

8

rather than the March 2012 survey was also inconsistent with the Corps' practice of performing a pre-dredge survey within six months of the start of dredging (finding 5). While Mr. Preston performed a "quick map check" on the March 2012 survey, his motivation was to check the accuracy of the new equipment, not to verify the quantity estimate to be provided in the solicitation (finding 7).

We recognize that precedent provides that the government is not required to take extraordinary measures to ensure an accurate estimate. *Medart, Inc. v. Austin*, 967 F.2d 579 (Fed. Cir. 1992). In *Medart*, the Federal Circuit considered a claim on a contract to supply cabinets to federal agencies in locations around the world. *Id.* at 580. The solicitation included estimates based on the number of cabinets ordered in each of three delivery zones. *Id.* During the course of performance, the government's estimate proved to be much higher than the actual need and the contractor contended that it experienced devastating losses. *Id.* Citing *Womack*, the Federal Circuit rejected the contractor's argument that the agency should have polled end users because the military alone used the cabinets at hundreds of sites around the world and there was no central site to obtain accurate predictions of orders. The Court of Appeals held that the government used information that was reasonably available; it need not search for or create additional information. *Id.* at 582.

In *Womack* the Court of Claims reached a different conclusion in a case stemming from a contract for the preparation of plats and a historical index for each township in Utah. The work involved transposing information contained in a Control Document Index onto title and use plats. The specifications estimated that this index would consist of 65,000 index cards that were being created by another contractor, York Tabulating Service (York). As it turned out, the estimate was quite low and York created 105,000 cards, resulting in additional work. *Womack*, 389 F.2d at 795-96, 798. The Court of Claims entered judgment for the contractor, holding that there was additional relevant information that was "reasonably available" to the agency in making its estimate. *Id.* at 799. First, the court held that the agency could have analyzed its own indexes of film rolls containing microfilm of millions of title and usage source documents, to determine a minimum number of index cards for Utah. *Id.* at 799. Second, at a time shortly before contract award when York had created only about 64,000 index cards and reported that it was almost finished, the court held that the agency could have examined York's production records and asked York more probing questions as to the number of index cards yet to be produced. *Id.* at 800.

We hold that the facts in this appeal are more similar to *Womack* than *Medart*. As we have found, by the time the Corps issued the solicitation it had already done the vast majority of work required to estimate payable quantities using the 2012 survey. Mr. Preston and his team spent 3 days in Boston Harbor in March 2012 performing the survey; they then spent the next 1.5 months analyzing the data (findings 6-7). The only task remaining at the time of solicitation was to run the product of this effort through the MicroStation software program (finding 11). While this took an additional

9

day of work, we find it to be within a reasonable level of effort because it was far easier than the review and analysis of agency and contractor records (using 1950s technology) that the Court of Claims found to have been warranted in *Womack* and is not in any way comparable to the worldwide polling effort that the Federal Circuit rejected in *Medart*.

At the time of the solicitation the Corps knew that volumes of dredged materials can change over time. For this reason, the Corps generally completes a survey within six months of the start of dredging (finding 5). Despite this, and despite having performed almost all of the work required to produce an estimate using the March 2012 survey, the Corps decided to use a survey that was more than a year old as the basis for the estimate in the solicitation. The Corps also neglected to inform bidders of the existence of the 2012 survey, which prevented them from performing their own analysis. The Variation in Quantity clause is only intended to protect the government against variations in quantity that are not reasonably predictable at the time of the estimate. *Womack*, 389 F.2d at 801. Because a variation in the payable quantity was entirely predictable, and because the variation in the quantity clause may not properly be used to excuse the estimator from using and disclosing relevant information that is reasonably available to him (*id.*), we hold that, Burnham has established liability and that its damages are not capped by the variation in estimated quantity clause.

*Shipping Traffic*

We reject Burnham's shipping traffic claim because it has not proven that boat traffic was above normal or beyond that identified in the contract. As to the former point, Burnham has not produced any evidence that shows how commercial shipping in the harbor during contract work compared with historical use. With respect to the limited information Burnham has provided during the contract term, the three commercial ships that Burnham identified on 23 August 2012, for example, do not strike us as clearly beyond what could have been reasonably expected. Nor are we particularly surprised that there was heavy recreational boat traffic on Labor Day weekend, or on other days in the late summer/early fall. Burnham largely appears to be complaining about delays caused by third parties (that is, the commercial ships and recreational craft) but precedent does not allow a contractor to recover from the government for delays caused by third parties. *See Contrack International, Inc.*, ASBCA No. 59917, 16-1 BCA ¶ 36,532 at 177,954-55.

The Channel Traffic clause in the contract specifically alerted Burnham to the risk of delays caused by other ships (finding 22). This clause specifically warned Burnham that: 1) deep draft commercial vessels, fishing vessels, and numerous small recreation and commercial craft may cause some interference with contract operations; 2) restrictions on vessel movement are in place when LNG tankers traverse the harbor; 3) Burnham would be required to conduct work in such a manner as to obstruct navigation as little as possible; and 4) in the event its plant obstructed the channel so as

10

to make it difficult or endanger the passage of any vessels, Burnham would be required to move its plant. Thus, the contract provided Burnham with ample warning of the challenges it would face. Put another way, Burnham has not identified any language in the contract in which the Corps warranted that Burnham would be free of insouciant recreational boaters speeding too close to its dredge or that its operations would take priority over routine commercial and cruise ship operations.

Burnham reads the Channel Traffic clause much differently, contending in its brief that the government warranted that the work site would be available except for times when LNG tankers were transiting the harbor (app. br. at 14). We disagree. While the clause does speak of restrictions on Burnham moving its vessel when LNG tankers are traversing the harbor, this does not in any way limit other warnings in the clause, namely, that multiple types of ships may interfere with Burnham's operations, that it would have to avoid obstructing navigation, and that it would be required to move its barge when it obstructed traffic. Burnham's reading would essentially read these provisions out of the contract, but we are required to read the contract in such a way as to give meaning to all of its terms. *Bell/Heery, J.V. v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014).

Burnham cites the Federal Circuit's opinion in *Olympus Corporation v. United States*, 98 F.3d 1314 (Fed. Cir. 1996), in support of a contention that government interference with work site access may constitute a breach of the government's duty to cooperate (app. br. at 14). Burnham's citation to *Olympus* is incomplete. The full sentence we believe it is referring to reads:

> While interference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate, the government is not responsible for third-party actions such as labor strikes that delay a contractor's performance, absent a specific contractual provision.

*Olympus*, 98 F.3d at 1318. The Federal Circuit held that the government was not liable to the contractor for delays caused by a strike to another contractor. *Id.* This is consistent with our holding above that the government is not responsible for third-party delays.

Accordingly, we deny Burnham's appeal with respect to shipping traffic delays.

11

## CONCLUSION

We sustain the appeal with respect to the claim that the government misrepresented the quantities of payable materials, otherwise we deny the appeal. The appeal is remanded to the parties for negotiation of quantum.

Dated: 13 December 2017

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60780, Appeal of Burnham Associates, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals