**CHEMICAL TECHNOLOGY, INC.**

v.

**The UNITED STATES.**

No. 354–78.

United States Court of Claims.

March 25, 1981.

Thomas H. Tate, Washington, D.C., for plaintiff; Hugo N. Gerstl, Monterey, Cal., attorney of record, Gerstl & Gorman, Inc., Monterey, Cal., of counsel.

Robert M. Hollis, Washington, D.C., with whom was Acting Asst. Atty. Gen., Thomas S. Martin, Washington, D.C., for defendant;

Carol A. Tootle, Washington, D.C., of counsel.

Before NICHOLS, KUNZIG and SMITH, Judges.

PER CURIAM:

This case comes before the court on defendant's request, filed April 15, 1980, for review by the court of the recommended decision of Trial Judge Robert J. Yock, filed January 16, 1980, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, plaintiff's motion for summary judgment on the issue of entitlement is granted and defendant's cross-motion is denied with the case remanded to the Armed Services Board of Contract Appeals to determine the amount of recovery and for further proceedings as set forth in the trial judge's conclusion.

OPINION OF THE TRIAL JUDGE

YOCK, Trial Judge: This contract case involves an appeal from a decision of the Armed Services Board of Contract Appeals (hereinafter the Board).[1] That decision affirmed the contracting officer's denial of plaintiff's claim for additional compensation under a mess attendant services contract performed at the Naval Construction Battalion Center, Port Hueneme, California. The plaintiff contended before the Board that it was entitled to receive an equitable adjustment for feeding four battalions of reservists who performed their 2-weeks' active duty for training (Reserve Readiness Duty—REDDU) at Port Hueneme in March, April and May of 1976. The costs of feeding these reservists were allegedly not contemplated by the parties at the time they entered into the contract due to faulty Government meal estimates. On cross-motions for summary judgment, the parties seek review of the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976).

For the reasons set forth below, it is concluded that the Board decision should be reversed and that plaintiff's motion for summary judgment should therefore be granted.

*Background*

The pertinent facts found by the Board or otherwise justified by the administrative record are hereinafter set forth.[2]

On April 18, 1975, the Naval Regional Procurement Office, Long Beach, California, issued an Invitation for Bids (IFB) for the procurement of mess attendant services in Food Service Building No. 61 at the Naval Construction Battalion Center, Port Hueneme, California, for the upcoming fiscal year (July 1, 1975 to June 30, 1976). Bid opening was conducted on May 22, 1975 and on June 28, 1975 contract No. N00123–75–C–1441 was awarded to plaintiff Chemical Technology, Inc. (hereinafter CTI).

Performance was to be from July 1, 1975 to June 30, 1976, with options to extend through September 30, 1978. Plaintiff was to be paid at a rate of $29,135.70 per month for the first 2 months and $19,932.70 for the remaining months of the initial year; option periods were to be priced when options were exercised. Services specified under the contract included the cleaning of the mess facility, equipment, utensils, dishes, and trays; the operation of the dishwasher; the serving of meals, including the setup and resupply of serving lines; and the preparation of some food items.

Pertinent IFB provisions, all of which were later incorporated into the awarded contract, are set forth hereafter:

---

1.  ASBCA No. 21768, 78–2 BCA ¶ 13,338. Although there was some evidence on quantum presented administratively, it was agreed between the parties that the Board's. decision would be limited to liability.

2.  See *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979), and cases cited therein.

SECTION J—SPECIAL PROVISIONS
PRICE ADJUSTMENTS FOR VOLUME
VARIATIONS*

\* For the purpose of calculating any price adjustments pursuant to this clause, determinations of monthly volume meal variations shall *exclude* contractor employee meals served.

(a) There will be no price adjustment for variations in the number of meals served per month unless such variations are greater than 25 percent (up or down) from the Estimated Monthly total in paragraph 2 of Attachment A.

(b) To the extent any monthly volume variation exceeds 25 percent of the estimated monthly total in paragraph 2 of Attachment A the contract price will be equitably adjusted for the variation in excess of 25 percent in accordance with the Changes clause in Section L.

(c) This adjustment will be made only on a monthly basis and daily fluctuations will not be considered except as they affect the monthly total.

Section F of the contract, under part F.1—*Scope of Work*, states:

(b) The Contractor shall provide, in addition to the specification services set forth in the Specifications for Mess Attendant Services, emergency services requested by the Food Services Officer. These requests shall be deemed to be changes within the meaning of the "Changes" clause and shall be subject to the provisions of that clause.

Section K of the contract, under part (a)(6), states:

(a) The Food Service Officer of the Activity is designated as the official representative of the Contracting Officer for the following areas:

\*　　\*　　\*　　\*　　\*　　\*

(6) Declaration of an "Emergency" whereupon additional services are to be furnished by the Contractor, as provided in Section F, paragraph F.1(b), hereof.

The General Provisions further included standard Changes (ASPR 7–1902.2, 1971 NOV)[3] and Disputes (ASPR 7–103.12(a), 1958 JAN) clauses.

The meal hours and estimated number of meals from paragraph 2 of Attachment A of the contract were:

2. Meal Hours and Estimated Number of Meals

a. Meal hours are as follows:

| MEAL HOURS | MON-THUR | FRIDAY | SATURDAY | SUNDAY/ HOLIDAY |
|---|---|---|---|---|
| BREAKFAST | 0600–0715 | 0600–0715 | 0800–0900** | 0800–0900** |
| BRUNCH | | | 1000–1200 | 1000–1200 |
| LUNCH | 1100–1245 | 1100–1245 | | |
| DINNER | 1600–1730 | 1600–1730 | 1600–1730 | 1600–1730 |
| LATE DINNER | 1800–2200 | | | 1800–2200 |

\*\* To accomodate [sic] Naval Reserve personnel training on board the Center, Saturday & Sunday breakfast hours will be from 0600–0900 zero to two times per quarter.

b. Estimated number of meals per month:
July and August 1975—70,000
September 1975 through September 1976—45,000

Approximately 2 months before the IFB went out on the street in this case, the Navy Regional Procurement Office, Long Beach, California, by letter dated February 14, 1975, to the Commanding Officer of the Naval Construction Battalion Center, Port Hueneme, California, requested information regarding the estimated number of meals per month to be required at Port Hueneme

3. Section L of the contract involved herein, makes this Changes Clause applicable. The Board erroneously cited ASPR 7–103.2, 1958 JAN.

for the upcoming fiscal year (July 1, 1975— June 30, 1976). These meal estimates were necessary and in fact were a critical element for the Procurement Office to be aware of in order to properly advise potential bidders of the scope of the contract, through the IFB. The letter request was forwarded by the Commanding Officer of the Construction Battalion Center at Port Hueneme to the Food Service Officer at Port Hueneme, who was the Navy official responsible for preparing the requested meal estimates.

Chief Warrant Officer (CWO–3) Royal Gene Ryan was the Food Service Officer at Port Hueneme from November 1973 until August 1976. In late February 1975, Mr. Ryan, with the assistance of his Chief Mess Management Specialist, Senior Chief Sanchez, prepared the monthly meal estimate for the contract awarded to the plaintiff.

CWO Ryan had been in the U.S. Navy since 1957 and had held several Food Service Officer positions prior to assuming his duties at Port Hueneme. However, he apparently had only prepared one meal service estimate (that being in February/March of 1974 for the preceding year's contract) prior to the estimate involved in this contract.

In preparing the estimate for the contract in issue, CWO Ryan first contacted the personnel offices for all of the active duty units located on the base to obtain figures as to their anticipated strength for the coming fiscal year. He apparently did not communicate with anyone in any command outside of Port Hueneme (e.g., Navy Personnel Headquarters, Washington, D.C.) in regard to determining the projected inflow and outflow of personnel at Port Hueneme for July 1, 1975 through June 30, 1976.

In addition to obtaining anticipated strengths from the various personnel officers, CWO Ryan consulted other sources, such as the previous year's meal count recapitulations and barracks records, in order to arrive at a percentage "utilization factor" for the previous year. In preparing the estimate, he did not have a specific month-by-month personnel count of all the units at Port Hueneme. He found the average monthly on-board population. The previously arrived at "utilization factor" was multiplied against this average monthly figure to find the estimate of the average number of meals to be served each month. This figure was adjusted by adding the number of meals estimated to be served as a result of recurring events such as weekend reservists and cash sales (these estimates were taken from historical data). With these adjustments, the monthly estimates given in the IFB (70,000 for July and August 1975 and 45,000 for all other months in the contract) were arrived at. The above information was testified to by Mr. Ryan and was not subject to any documentary checks. Mr. Ryan had not kept his working papers because he was unaware of any regulatory requirement to keep them.

In the course of preparing the estimate, CWO Ryan consulted a Naval Supply Systems Command Instruction which gave instructions to contracting officers and food service officers on contracting for mess attendant services. NAVSUP Instruction 4061.8B reads:

B2b. *Estimating the number of meals to be served monthly* —(Specification for mess attendants services—Attachment A, paragraph 2b): The estimated number of meals to be served should be based on recent past experience of meals fed as reported in NAVSUP Form 1292 and adjusted for known or anticipated changes. To arrive at this monthly estimate, activities are advised to use the average of the highest and lowest months for the past year (less the number of meals that do not affect services under contract). This average should be used as the appropriate base to review the effect of [25]% variation up or down on all months. As illustrated in part A, paragraph 6 (Instructions to Contracting Officers), months that are or expected to be substantially different (exceeding [25]%) should be specified and, if applicable, the proper additions or subtractions in facilities operated denoted (i.e., serving lines, sculleries, and space). Work papers or other

documentation in support of monthly estimates should be retained.[4]

The NAVSUP Instruction also instructed the Food Service Officer to itemize nonrecurring events (*i.e.*, Special Events), which should be specified in paragraph 10 of Attachment A of the contract.[5] The pertinent part of that instruction reads:

Special Events, covers those activities requiring service for nonrepetitive events, e.g., feeding Boy Scouts, graduation exercises, etc. These should be itemized to include time, number to be fed, type of service required, etc.

CWO Ryan did not follow the instructions contained in NAVSUP Instructions 4061.8B verbatim. In fact, the Special Events clause, paragraph 10 of Attachment A was totally omitted from the IFB and the contract. He did not average the highest and lowest monthly meal counts from the previous year, as the instruction advised, because he did not believe that this would produce an accurate estimate. Mr. Ryan based this conclusion on the fact that the previous year's transient student population had been unusually high due to a change in training facilities and a substantial decrease in on-board personnel, and a substantial decrease in on-board personnel strength was anticipated in the coming year. He felt the most important part of the instruction was its guidance that the estimate should be based on recent past experience of meals fed, and adjusted for known or anticipated changes.

It should be noted at this point that the average meals fed per month in the preceding fiscal year (*i.e.*, FY 1975 contract) was 76,542. The high monthly total of actual meals served was 95,619 meals served in February 1975 and the low monthly total of actual meals served was 65,599 meals served in June 1975. CWO Ryan estimated 45,000 meals to be served during the FY 1976 contract in all months except July and August of 1975.

Also of note in this connection is that there were four reserve Naval Construction Battalions (containing approximately 500 men each) that did their 2-weeks' active duty for training at Port Hueneme in FY 1975 (July 1, 1974—June 30, 1975) which was the fiscal year preceding the contract year in question. During FY 1973 and 1974, no reserve battalions trained for 2 weeks at Port Hueneme.

In developing the estimate, Mr. Ryan also took into consideration anticipated events that might significantly alter the number of meals served in any given month. In accordance with NAVSUP Instruction 4061.-8B, if any such event was anticipated to increase or decrease the average monthly figure by 25 percent, this month was to be highlighted in a separate estimate. In an effort then, to comply with the regulation's suggested estimating and highlighting procedure, Mr. Ryan sought to ascertain whether any reserve Naval Construction Battalions would be conducting their 2-weeks' active duty for training (REDDU) at Port Hueneme during the contract period. The fact that reserve Naval Construction Battalions did or could do their 2-weeks' active duty for training at Port Hueneme was clear to Mr. Ryan since two reserve battalions were on board the base (and eating at his mess hall facility) at the very same time (late February—early March 1975) that he was compiling the meal estimates for inclusion in the FY 1976 contract at issue in this case.

In order to obtain this reserve battalion information, CWO Ryan called Commander Stallman, who Ryan testified was the Chief Staff Officer of the 31st Naval Construc-

---

4. The NAVSUP Instruction had been altered to reflect the change from highlighting 15 percent variations to highlighting 25 percent variations. This change was made by the Navy Food Service Systems Office, Food Flash of February 24, 1975.

5. The NAVSUP Instruction also instructed the contracting officer "If it is anticipated that the number of meals to be served (or other requirements) will be substantially different during some periods of the contract, the solicitation should so state."

tion Regiment at Port Hueneme. The 31st Naval Construction Regiment was the active duty Naval activity on board Port Hueneme that was responsible for coordinating reserve training on the base.[6] Commander Stallman indicated to Mr. Ryan that he could not give any information to Mr. Ryan at that time (late February—early March 1975) as to possible reserve Naval Construction Battalion's 2-weeks' active duty for training during FY 1976 because Naval reserve plans had not been firmed up or finalized. In short, Commander Stallman told Mr. Ryan that he (Stallman) had not been notified by any competent Navy authority as to possible reserve 2-weeks' training at Port Hueneme for the upcoming fiscal year. He therefore could not provide any precise dates or numbers of persons to be fed, or even whether any reserve battalions would be training at Port Hueneme. Commander Stallman was not called as a witness by either party and there is no other indication in the record whether Mr. Ryan asked Commander Stallman further whether anybody else in the Navy establishment on or off base might be able to give him more Naval reserve training plan information for FY 1976. The record does reflect that Mr. Ryan did not go any further than Commander Stallman to determine whether any reserve Naval Construction Battalions might be coming to Port Hueneme to do their 2-weeks' active duty for training.[7]

Since Commander Stallman was unable to provide any positive and precise information to him, Mr. Ryan did not provide a special event estimate in the IFB to highlight any potential influx of 2-week active duty for training reservists at Port Hueneme for the FY 1976 contract. In his testimony, Mr. Ryan indicated that if the reservists did come to Port Hueneme for their 2-weeks' training at any time during the contract period, that it would be an unanticipated event, which would be taken care of, in his opinion, by the Volume Variation clause of the contract. Had he been able to obtain specific dates and numbers regarding the 2-week reservists, Mr. Ryan testified that he would have highlighted those figures in the IFB (and contract) as a special event.

As a result of the above factual events, CWO Ryan did not highlight using the Special Events clause, any potential influx of 2-week active duty for training reservists coming to Port Hueneme, nor did he crank into the meal estimates (*i.e.,* 45,000 per month) any numerical factor for the reservists showing up for their 2-weeks' training. Thus, the IFB contained no notice whatsoever to potential bidders that there remained the possibility that during the course of the contract several reserve Naval Construction Battalions might show up to train and be fed at Port Hueneme.

In developing a planning schedule for training of reserves, the 1st Naval Reserve Construction Brigade, Los Angeles, California, submits training plans to the Chief of Naval Operations (CNO) for approval.[8] If the training plans are approved, and if the

---

**6.** It is also fair to characterize Port Hueneme, California, as one of several major Naval bases used and well designed for Naval Construction Battalion (Seabee) training, both for active duty and reserve forces. The record further reflects that starting in 1973, with the wind down of the Vietnam war effort by U.S. active duty forces, the Construction Battalion Center, Port Hueneme assumed an increasingly important role in support and training of Naval Reserve Construction Battalions.

**7.** CWO Ryan was aware that various reserve units and individual reservists would be drilling on board Port Hueneme on weekends to fulfill their inactive duty training obligations. This weekend reservist training was duly noticed in the IFB (and contract), which indicated that extended breakfast weekend feeding hours would be necessary to feed the reservists from zero to two times per quarter. This weekend reservist notation contained in the IFB was the only reference to reservists' feeding contained in the IFB.

**8.** Although the record is somewhat sketchy regarding the steps the Navy uses to plan their reserve training programs, the Board was able to make outline findings, pertinent parts of which are reproduced herein for purposes of understanding the decision reached herein.

Construction Battalion Center at Port Hueneme is selected as a training site, the 31st Naval Construction Regiment prepares an Operations Plan. The 31st Regiment, which is where CWO Ryan sought information regarding anticipated reservist training, is not involved in the initial planning of whether reserves will train at Port Hueneme.

On March 7, 1975, Vice Admiral Pierre N. Charbonnet, Jr., USN, Chief of Naval Reserve, testified before the U.S. Senate Committee on Appropriations that nine Naval Reserve Mobile Construction Battalions (NRMCB) were scheduled to be eliminated in FY 1976. The Reserve Naval Construction Force (RNCF) reduction was subject to congressional review and approval as part of the FY 1976 Department of Defense Appropriations Act.[9]

By letter dated June 3, 1975, the Commander, 1st Naval Construction Brigade, Los Angeles, California, requested the 31st Naval Construction Regiment, Port Hueneme, to provide information concerning proposed Reserve Readiness Duty (REDDU) training in 1976. This request stated:

1. The RNCF force reduction/realignment schedule is not firm at this time and inhibits the development of FY 76 REDDU schedules. Planning requires however, that a tentative REDDU schedule be developed for the existing 17 RNMCB's with the capability contained in that schedule to delete those RNMCB's which could be disestablished when the final approved force reduction decision is reached.

2. Enclosure (1) is forwarded and outlines the training desired for units of the Brigade. The eight surviving RNMCB's noted in the Brigade's previously published reduction plan have been noted on enclosure (1) and should have first priority in assignment of best time frames for training/facilities availability.

3. COM31stNCR is requested to review enclosure (1) to see if the training desired can be provided at CBC, Port Hueneme for units noted. If the training can be provided, then dates commencing in January, are requested for the units which best meet active duty loading at the base requested. This information will be used at the June 27 Conference at Port Hueneme to develop a final Brigade Schedule.

The referenced enclosure (1) was the "Tentative FY 76 REDDU Schedule." It scheduled four battalions for 2-weeks' training duty at Port Hueneme during FY 1976—preferably starting in January 1976; two battalions of which were subject to possible elimination under the scheduled force reduction.

On June 24, 1975, the Commander, 31st Naval Construction Regiment, Port Hueneme, proposed tentative REDDU schedule dates for these four reserve battalions in response to the June 3, 1975, request. The dates listed were April 4—May 15, 1976 for the four battalions. The record reflects that a reserve planning conference was held at the Naval Construction Battalion Center, Port Hueneme, on June 27, 1975, at which, presumably, the dates of March—May 1976 were arrived at for the four battalions to train at Port Hueneme. On July 29, 1975,

---

9. Record of Senate Hearings before the Committee on Appropriations "Department of Defense Appropriations—Fiscal Year 1976" 94th Cong., 1st Sess. at 1100, 1111—Testimony of Vice Admiral Pierre N. Charbonnet, Jr., USN, Chief of Naval Reserve/Director of Naval Reserve on March 7, 1975.

The Department of Defense Appropriation Act, 1976, was enacted of February 9, 1976 (Pub.L.No.94–212, 90 Stat. 153). By enactment of this legislation, Congress refused to approve the Navy's proposed reduction in the number of Reserve Naval Mobile Construction Battalions. Conference Report on H.R.Res. 9861, Department of Defense Appropriations, Fiscal Year 1976, 94th Cong., 1st Sess., 121 Cong.Rec. 39786, 40223 (1975) (remarks of Representatives Montgomery and Mahon on December 12, 1975, at 40223–36); Conference Report, Department of Defense Appropriations, Fiscal Year 1976, 94th Cong., 1st Sess., 121 Cong.Rec. 40526–31 (1975) (remarks of Senator McClellan on December 15, 1975). The above rejection by the Congress of the President's proposed budgetary reductions in the U.S. Military Reserved Force followed a familiar historical pattern of several years running.

the Commander, 1st Reserve Naval Construction Brigade first promulgated for distribution the FY 1976 REDDU schedule. These dates (March—May 1976) later proved to be the actual dates that the four reserve battalions appeared at Port Hueneme to train. On August 20, 1975, the Commander, 31st Naval Construction Regiment, Port Hueneme, promulgated an Operation Plan for Reserve Naval Construction Force calendar year 1976 Readiness Duty Training at the Construction Battalion Center, Port Hueneme, which incorporated the March—May 1976 drilling dates. There is nothing in the record which indicates that the Food Service Officer at Port Hueneme, or the contracting officer at the Procurement Center, Long Beach, were made aware of the planning for the reservists' 2-week activation at Port Hueneme until CWO Ryan received the Operation Plan in September 1975. Thus, it was unanticipated by the contracting parties at the time of the solicitation, that four battalions of reservists would conduct their 2-weeks' active duty for training at Port Hueneme during the spring of 1976.

Mr. William L. Devries is president of plaintiff (CTI). Prior to coming to work for CTI, he worked for Manpower, Inc. for 10 years and in 1966, became its division manager responsible for Government contracting. In 1973, he left Manpower to originate and establish Chemical Technology, Inc. Mr. Devries personally prepared CTI's bid on the subject contract. Prior to bidding, he had no familiarity with the feed figures at Port Hueneme for 1975 and therefore relied on the IFB information furnished by the Navy. In preparing the bid, Mr. Devries visited Port Hueneme to inspect the food service facilities and spoke with operating personnel but not with the Food Service Officer. The work papers developed by Mr. Devries during this trip were admitted into evidence during the hearing. Mr. Devries' understanding from reading the IFB was that the sole requirement for reservists would be to extend the breakfast hours from zero to twice per

quarter to accommodate weekend reservists. He was never made aware prior to the commencement of performance that there might be or would be a large contingent of reservists coming to Port Hueneme for their 2-weeks' active duty for training (REDDU).

In early September 1975, CWO Ryan received the 31st Naval Construction Regiment Operation Plan which indicated that four battalions of reservists would be performing 2 weeks' active duty for training at Port Hueneme in March, April and May of 1976. Mr. Ryan then contacted plaintiff's project manager at Port Hueneme, Ms. Lillian Ulmer, and informed her that four battalions of reservists (with approximately 500–600 men per battalion) would be coming between March and May 1976. At this time, Mr. Ryan requested of Ms. Ulmer that the Navy be permitted to use reserve mess management specialists on one serving line during the noon meal each day to do jobs normally done by the contractor's employees. The Navy desired to use reservists as such for reserve training purposes. Ms. Ulmer later informed him that her superiors in Washington had no objection to the requested use of military personnel. During these discussions, Ms. Ulmer informed Mr. Ryan that CTI would have to hire additional people or assign additional hours to its current staff to accommodate the feeding of the four battalions. Mr. Ryan gave no written documents concerning the reservists coming to Port Hueneme to Ms. Ulmer at that time; he merely informed her of his receipt of the Operations Plan. Subsequent to these initial discussions, Ryan testified that he informed her of the specific details of the reserve active duty training periods as they became available.

Mr. Devries testified that he never received any written or oral communications directly from the Navy regarding the reservists prior to their arrival. The only information Devries had prior to the reservists' arrival was a telephone call from his manager at Port Hueneme in September

1975 indicating that reservists were due to train there. The number of people expected was not mentioned and it was explained to him by his manager that this would have no impact on CTI's operations.

In accordance with the 31st Naval Construction Regiment Operation Plan, Reserve Naval Construction Battalion 18 trained during the 2-week period March 22 to April 3, 1976. Reserve Naval Construction Battalion 2 trained from April 4 until April 18, 1976. Reserve Naval Construction Battalions 16 and 17 trained from April 25 to May 9, 1976.

Under the contract, CTI was required to staff serving lines as follows: breakfast—2; lunch—3 (weekdays) 2 (Saturdays, Sundays, holidays); dinner—2; late dinner—1 (Monday–Thursday, Sundays, holidays). At some point during the contract period, prior to the arrival of the reservists, the Food Service Officer had elected to terminate one of the lunch lines required under the contract and also closed off a specified serving area due to lack of use. The arrival of the reservists in March, April and May 1976 required the reopening of the terminated lunch line and the dining area. The additional lunch line was staffed and replenished by reservists. CTI personnel had little to do with the additional lunch line except cleaning it after use and preparing the salads served there. The presence of the reservists also necessitated the operation of a second dish belt to be used on the dishwashing equipment during the peak parts of the noon meal. This additional dish belt was shut down when the 2-week reservists departed Port Hueneme. Additionally, a third breakfast line was opened for a few days while the reservists were training, but this was discontinued when it was found to be unnecessary. An additional milk area, that had not been used prior to the arrival of the reservists, was also opened.

During the period of March through May 1976, the contractor was required to make various adjustments to accommodate the increased number of personnel utilizing the Port Hueneme dining facility. Most of CTI's employees at Port Hueneme were part time, thus plaintiff's response to the additional workload in March, April and May 1976 was to stretch out the work schedule of these employees when needed. Conversely, when there was a decrease in the number of people to be fed, the part-timers' hours were decreased. Mr. Devries testified that as a result of the reservists' arrival, plaintiff's costs went up significantly in March, April and May 1976. The increased workload necessitated hiring additional people and increasing the hours of others. Details as to the increased costs were not furnished as the parties stipulated that the question of quantum would be left to their negotiations once entitlement was resolved by the Board. Mr. Devries testified that there is, in his opinion, a direct correlation between the number of meals served and the number of labor hours expended in serving them. In addition, Mr. Devries said that for every person that comes into the mess hall, work such as serving, clean up, and more food preparation is generated. Mr. Devries also stated that plaintiff was advised that the number of meals to be served would double during the reservists' stay and that the peak would run for 3 months. Plaintiff increased its staff accordingly; however, the volume did not stay constant for any 30-day period. Because the information plaintiff received from the Government was never precise as to dates or numbers, Devries testified CTI had to keep the increased staff during the entire period. Plaintiff's ability to adjust to the fluctuations in the workload was further influenced by the fact that its employees at Port Hueneme were unionized.

The Recapitulation of Meal Records (NAVSUP Form 1292) for the months of March, April and May 1976 shows the number of meals served for those months as follows:

| | Meals Served to Reservists | Meals Served to Active Duty Personnel | Miscellaneous Meals Served* |
|---|---|---|---|
| March 1976 | 10,528 | 39,400 | 8,348 |
| April 1976 | 23,740 | 32,528 | 7,339 |
| May 1976 | 10,982 | 35,917 | 6,335 |
| Other 7 Mos.** Average | 1,190 | 33,192 | 7,277 |

\* Meals served to Marine Corps, and Army personnel and cash sales.

\*\* Average of the other 7 contract months for which the estimate of 45,000 meals per month applied.

These figures reflect the dramatic increases in feed figures (utilization of dining facilities) when 2-week active duty for training reservists appear on a base.

For the 12-month period of contract performance, the total number of meals served exceeded the estimated quantity by the 25 percent Volume Variation clause parameters for 2 months. Meals actually served in March 1976 totaled 58,276 (2,026 meals in excess of the 45,000 estimate plus 25 percent). Meals actually served in April 1976 totaled 63,607 (7,357 meals in excess of the 45,000 estimate plus 25 percent). In May 1976, 53,234 meals were actually served, which does not exceed the 45,000 meal estimate plus 25 percent.

On June 24, 1976, plaintiff submitted its initial claim to the contracting officer, requesting an equitable adjustment/modification to the contract for the expenses of feeding all the 2-week active duty reservists. The request cited the Changes and Emergency Services clauses of the contract as authority. An exchange of correspondence between the plaintiff and the Government followed in which the parties' respective positions were defined.

The contracting officer was willing to grant plaintiff an equitable adjustment pursuant to the Volume Variation clause (expenses in excess of the meal estimate plus 25 percent) for a total of $4,156.67. However, the Government was unwilling to grant the plaintiff *all* expenses associated with feeding the unanticipated 2-week reservists. It did not believe that the influx of reservists on the base constituted an emergency as contemplated by the contract, nor did it believe that the Government had negligently prepared its meal estimates or in any other way had misled CTI. Consequently, in the Government's view, the Volume Variation clause controlled and that was the total equitable adjustment that plaintiff was entitled to under the contract.

The contracting officer's final decision to this effect rejecting the plaintiff's claim was issued on January 19, 1977.

The plaintiff timely appealed the final decision to the Board, which on July 19, 1978, issued its decision affirming the contracting officer's final decision. The Board in a 3–2 split decision awarded plaintiff an equitable adjustment only for that amount of compensation ($4,156.67) in excess of the 25 percent volume variation parameters pursuant to the Volume Variation clause of the contract. The Board rejected the plaintiff's contention that it was entitled to recover *all* expenses associated with feeding the unanticipated 2-week reservists because, in the plaintiff's view, the Government's meal estimates had been negligently prepared, which resulted in the failure to provide bidders with adequate notice of the scope of the contract. The Board also rejected the plaintiff's contention that it was entitled to an equitable adjustment pursuant to the Emergency Services clause of the contract.

Thereafter, plaintiff brought the present action in this court.

### Discussion

Before this court, the plaintiff contends that the Board's decision is not supported

by substantial evidence in the record and is incorrect as a matter of law. Specifically, the plaintiff argues two basic points. First, the plaintiff asserts that the Volume Variation clause should not limit its equitable adjustment recovery against the Government when the Government caused the additional expenses associated with feeding the 2-week reservists, due to faulty meal estimates contained in the IFB. The authority for awarding an equitable adjustment here would be based on the contract's Changes clause. Second, and argued in the alternative, the plaintiff asserts that even if the court does not agree with its "faulty estimate" theory, it should be entitled to an equitable adjustment based on the Emergency Services clause of the contract.

The defendant, not surprisingly, contends that the Board's decision is supported by substantial evidence in the record and is correct as a matter of law. The Government also argues that the Volume Variation clause is applicable in this case and limits the plaintiff's recovery to that amount already granted by the Board. This is so, states the Government, because the Government used reasonable care in preparing its meal estimates. In addition, the Government asserts that the Board was correct in determining that the Emergency Services clause was not for application in factual circumstances such as this.

Both parties agree that the leading case for application to the facts involved in this dispute is *Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793 (1968). They disagree, however, as to the result which the legal theory of that case dictates when applied to these facts.

It is the duty of this court to determine, under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976), whether the Board's administrative findings of fact are supported by substantial evidence and its conclusions of law are correct as a matter of law.

### Volume Variation Clause

(a) Events prior to the IFB date.

In commencing its decision, the Board first noted that the court has upheld the propriety of price adjustment for volume variation clauses such as the clause contained in the instant contract. It cited *Pacific Architects and Engineers, Inc. v. United States*, 203 Ct.Cl. 499, 491 F.2d 734 (1974).

The Board then moved on to *Womack, supra*, and stated:

In *Travis T. Womack, Jr., et al. v. United States*, 182 Ct.Cl. 399, 389 F.2d 793 (1968) the Court of Claims held that the risk assigned to the contractor by a similar 25% variation clause did not apply where the Government was negligent in preparing the estimate providing the base line for possible variations. As stated by the Court, "the clause does not require one party to bear the first 25 percent of the other party's negligence." According to the Court, the duty owed to bidders is to assure that the estimate made is " . . . the product of such relevant underlying information as is available to the author of the invitation . . . In short in promulgating an estimate for bidding—invitation purposes, the Government is not required to be clairvoyant but is obliged to base that estimate on *all* relevant information that is reasonably available to it." (182 Ct.Cl. at 412–3) In *Womack*, the Court found that information necessary for an accurate estimate was available, but not used by the persons who prepared the estimate. [78–2 BCA at 65,230]

It is clear from the above discussion that the Board correctly reads the legal standards this court feels should be applied to factual settings such as this.

The Board also discussed several of its own Board cases, which have applied the Womack standards. Two of the Board cases found negligent estimate preparation on the part of the Government (*Integrity Management International, Inc.*, ASBCA No. 18289, 75–1 BCA ¶ 11,235, and *Pied Piper Ice Cream, Inc.*, ASBCA No. 20605, 76–2 BCA ¶ 12,148). Two of the cases found that the Government used reasonable care in the estimate preparation (*American Maintenance*, ASBCA No. 18756, 75–2 BCA

¶ 11,407, and *Solano Aircraft Service, Inc.* ASBCA Nos. 20677, 20941, 77–2 BCA ¶ 12,-584). All of these cases were helpful to the court, but all can be distinguished factually from the instant case.

The Board then applied the legal standards enunciated in *Womack, supra,* and their own Board cases, to the facts of this case. The critical facts the Board found to be determinative on the issue of whether the Government failed to use reasonable care in preparing the meal estimates were contained in the following paragraph:

In the appeal now before us the similar issue is whether the Government was negligent in failing to include in the IFB some meal estimate for reservists called for two weeks active duty for training at Port Hueneme during FY 1975–6. At the time the monthly meal estimates were prepared the Food Service Officer was aware that reservists were training at Port Hueneme (February—March 1975). However, no reservists had trained at Port Hueneme during the prior two fiscal years. Such circumstances reasonably prompted inquiry by the Food Service Officer as to whether reservists would train at Port Hueneme during FY 1975–6. The Food Service Officer did inquire but, as indicated in our findings, the relevant information available prior to issuance of the IFB did not indicate when, how many, or even whether reservists would be called for active duty for training at Port Hueneme during FY 1975–6. [78–2 BCA at 65,230–31]

From these facts the Board concluded:

We conclude that in preparing the meal estimates included in the solicitation, the Government relied on the best available information concerning the status of possible reservist training. Although it might have been reasonable for the solicitation to caution bidders as to the possibility of reservist training during FY 1975–6, such a caution would have been most imprecise as to timing or numbers. *We conclude that it was reasonable for the preparers of the estimates to do what they did, that is omit any reference to*

*two week reservist training.* The teaching of the above cases is that the Government is not required to indulge in clairvoyance or speculation when preparing quantity estimates. Its duty is reasonably to take into account the relevant factual data. [78–2 BCA at 65,231 (emphasis added).]

█ It is with the above central conclusion that this court must part company with the Board's decision. Based on precisely the same facts as those relied on by the Board to justify its decision, plus several additional facts found by the Board or otherwise indisputable, this court is compelled to conclude that the meal estimate was indeed negligently prepared. It is this court's view that the meal estimate specifically, and the total IFB package in general, misled or in any event did not adequately inform bidders on this contract as to the scope of the contract they were bidding on. The Government did not place in the IFB information that was reasonably available to it, and consequently it may NOT use the Volume Variation clause to limit the plaintiff's equitable adjustment. When the reserve battalions showed up in the mess hall, the Food Service Officer required the plaintiff to feed the reservists. This was a constructive change in the contract terms, which was not contemplated by the parties at the outset of the contract, and which entitles plaintiff to an equitable adjustment outside of the parameters of the Volume Variation clause.

This court's conclusions stated above are based on the facts already specified herein as well as several points highlighted below.

The Food Service Officer at Port Hueneme in February 1975 was a Chief Warrant Officer (CWO–3) on active duty in the U. S. Navy. He had been in the Navy since 1957 (18 years). He had been to numerous schools and had numerous duty assignments, including being a Food Service Officer on other duty stations. He was aware that the military services are composed of two large blocks of personnel—reserve forces and active duty forces. He was aware that Port Hueneme, California, was

a significant base used by the Navy for training reserve and active duty naval construction battalions (Seabee units). He was aware that at the very same time (February/March 1975) that he was asked to prepare the meal estimates for the instant contract, that two reserve naval construction battalions were doing their 2-weeks' active duty for training (REDDU) at Port Hueneme. He was aware of this because he was feeding them and talking to them. He was aware also that reserve units utilized base facilities in high percentages during their temporary 2-weeks' stay on the base. Historic feed figures gave him this data. The reservists' presence on the base prompted him to call the active duty unit on the base responsible for coordinating reserve activity on the base: The Chief Staff Officer at that unit told him he had no idea when, or how many, or even if any reserve units would be coming to Port Hueneme to do their 2-weeks' training during the upcoming fiscal year because plans had apparently not been finalized at that point by the Navy. So at this point, the Food Service Officer gave up gathering any further reserve information. He then proceeded to put together his meal estimate and his other IFB information, which included absolutely no contingency for the likelihood of reservists showing up to do their 2-weeks active duty for training (REDDU) at Port Hueneme.

The facts of this case highlighted above and discussed at length in the background section of this opinion reveal that at the time of the preparation of the meal estimates, the Government was aware of the possibility that reservists might be training at Port Hueneme during the upcoming fiscal year (commencing July 1, 1975). Because firm dates and numbers of reservists could not be obtained, however, all reference to the possibility of 2-week reservists being present was omitted from the IFB in this case. The Government argues in its brief before this court that "it was *reasonable* for the preparers of the estimates to do what they did, that is, *to omit any reference to two-week reserve training.*" [Emphasis supplied.] As already indicated, the court reverses the Board on this point and rejects the argument of the Government that the Board was correct in finding this omission to be reasonable.

Faced with the knowledge that reservists might be at Port Hueneme in the upcoming year for 2-weeks' active duty for training and unable to obtain definite dates and numbers, there were several options open to the preparers of the estimates:

(1) They could list 2-week reservists' active duty for training as a special event, and specify additional compensation at a rate per battalion; or state that an equitable adjustment would be made under the Changes clause; or state there would only be additional compensation under the Volume Variation clause (if the estimate was exceeded by 25 percent). Or

(2) They could factor the possibility of reservists training for 2 weeks into the meal estimates by estimating, for example, that two battalions would be present during the year, and preferably stating in the IFB that this method had been used. Or, at the very least,

(3) They could footnote the meal estimates with a statement that 2-weeks' reserve training might occur, but no special provisions for compensation would be made, such as what was done with the weekend reservists' training.

However, the Government did the one thing and perhaps the only thing that this court cannot find to be reasonable under the circumstances. It totally omitted any provision in the IFB (e. g., Special Events clause or factor in the meal estimates) for the reservists and did not disclose the possibility of reservists doing their 2-weeks' active duty for training to the prospective contractor. By doing this, the Government effectively estimated that zero 2-week reservists would be present in the upcoming year. Under the facts of this case, the court cannot agree that a zero estimate was reasonable. Thus, this court finds that the estimates did not reasonably take into account all of the relevant factual data. *Womack v. United States*, 182 Ct.Cl. 399, 413, 389 F.2d 793, 301 (1968).

Additionally, by failing to disclose the possibility of 2-weeks' reservist training to the contractor, the Government not only failed to disclose all of the relevant facts to the contractor (such disclosure in this case might have remedied the failure to factor all of the relevant facts into the estimate) but the Government may have actually *misled* the contractor. *See Womack, supra,* 182 Ct.Cl. at 412, 389 F.2d at 800. By footnoting the Meal Hours and Estimated Number of Meals section of the IFB with an adjustment of meal hours for weekend reservists (whose overall effect on performing the services was negligible), the preparers may have impliedly represented that the specifications were accurate to within this degree of effect (negligible effect) or at least that the information on all reservist training (*i. e.,* including 2-weeks' active duty for training) was available to and used by the preparers. Since the IFB reflected a special adjustment for the effect of weekend reservists whose meal consumption was relatively small (apparently weekend reservists ate approximately 1,100 meals per month in the 9 months of the contract year when 2-week reservists were not present), a contractor could reasonably conclude that adjustments would have been made for the effect of the influx of a battalion of 600 reservists for 2-weeks' training (apparently each battalion consumed approximately 10,-500 meals in 2 weeks).

■ In fact, the record reveals that Mr. Devries believed that the only reservists encompassed by the contract were the reservists reflected in the contingency placed in the IFB (and the contract) for weekend reservists. Mr. Devries testified at the Board hearing that he understood that the sole requirement with respect to serving reservists would be to extend the breakfast serving line "zero to two times per quarter [of the year]." That is clearly the understanding that a reasonable, knowledgeable bidder reading the contract (IFB) could draw. The contract may well have been ambiguous in this regard. Such latent ambiguities are construed against the author of the document, *i. e.,* the Government. *See United Pacific Insurance Co. v. United*

*States,* 204 Ct.Cl. 686, 497 F.2d 1402 (1974); *Brezina Construction Co. v. United States,* 196 Ct.Cl. 29, 499 F.2d 372 (1971) and cases cited therein.

(b) Events between the IFB date and contract award.

After reviewing the events that transpired prior to the IFB date and concluding that the Government acted in a reasonable manner in that regard, the Board then turned its attention to the events which transpired between the April 18, 1975 IFB date and the June 28, 1975 date of award of the contract.

The Board noted that there was a letter request dated June 3, 1975 from the Commanding Officer of the 1st Reserve Naval Construction Brigade, Los Angeles, California. This letter requested the 31st Naval Construction Regiment at Port Hueneme to provide training dates for four reserve naval construction battalions to train at Port Hueneme in FY 1976. The letter noted that the President's proposed reduction in reserve naval construction forces inhibited the development of a firm REDDU schedule. Nevertheless, planning was going forward, hence, the request. The 31st Naval Construction Regiment at Point Hueneme responded by letter dated June 24, 1975 which specified that April 4—May 15, 1976, would be appropriate dates for the four units to train at Port Hueneme. The Board concluded from the above:

[T]he situation concerning reservist training during 1975–6 was still tentative and ambiguous. * * * The 3 June request clearly indicated that no firm numbers of reservists or training dates could be ascertained at that time. Neither the 3 June request nor the 24 June proposal were known to the Food Service Officer or procurement officials responsible for award of appellant's contract. The existence of this information alone, not available prior to issuance of the IFB, did not have sufficiently definite impact on appellant's obligations under the proposed contract as to (1) raise an inference that

the Food Service Officer or procurement officials should reasonably have learned about it prior to award, or (2) impose a duty on the Government to notify appellant prior to award as to possible reservist training, assuming for present purposes that appellant's bid might have been amended or the IFB reissued to all bidders. [78-2 BCA at 65, 231]

This court disagrees with these Board conclusions also. However, since this court has concluded that there was enough reserve training information reasonably available to the Food Service Officer prior to the IFB date and that such information should have been included in the IFB package, the point will not be belabored.

Nevertheless, two quick points should be made. First, the information contained in the two June letters indicate quite clearly that planning for naval reserve construction battalion forces was an ongoing matter. Even in the face of the President's proposals to Congress to reduce reserve construction battalion forces, and the Congress' inaction on that point, the Navy was planning to train 17 reserve construction battalions— four of which the Navy wanted to train at Port Hueneme. Secondly, it is clear from these letters that this planning was going forward in Los Angeles, California—a few short miles from Port Hueneme. The Food Service Officer, in short, could have found out a gold mine of reserve planning information by simply calling the 1st Reserve Naval Construction Brigade, at Los Angeles. It is crystal clear that this information was available prior to the award of the contract, and the letters would raise the clear inference that this planning information was available well in advance of the IFB date, if a diligent person had but asked.

In summary, as to the Volume Variation clause, the law does not allow the Government to mislead the contractor by failing to disclose important relevant information possessed by the Government, and then to apply the Volume Variation clause to a carelessly prepared IFB and basic meal estimate. The Government's superior knowl-edge, with regard to 2-weeks' reserve training, makes the specifications defective because of the deficient disclosure in this regard. In its dealings with contractors, the Government cannot provide inaccurate data in this manner and then be allowed to bar an equitable recovery by arguing that the resulting damages (in this case, a large increase in meals fed) fall within the 25 percent Volume Variation clause.

The variation clause was not meant to encompass circumstances such as this. That clause does not encompass a fluctuation which was unanticipated by the contractor solely because the Government did not disclose information which it possessed. A variation clause:

[A]fford[s] a flexibility sufficient to accommodate actual *deviations* from the estimate that are *not reasonably predictable* at the time that the estimate is made and during the time that it remains subject to reliance by the bidder. It embraces variations that are attributable to *facts* [including the existence of contingencies, *i.e.*, a known contingency is a fact] *that are not among those reasonably available to the estimator.* The latitude that it affords *may not* properly *be used to excuse* the estimator from using and disclosing relevant information that is *reasonably available* to him. [*Womack v. United States*, 182 Ct.Cl. 399, 413, 389 F.2d 793, 801 (1968) (emphasis added).]

Since the Government did not reveal to the contractor relevant information that was reasonably available to it and, in fact, actually misled the contractor, the Government must bear the economic risks in this dispute. The Board's conclusions to the contrary are not supported by substantial evidence and are incorrect as a matter of law.

### Emergency Services Clause

Since it is this court's view that the volume variation discussion in the preceding section decides the dispute, it becomes unnecessary to discuss plaintiff's contentions any further. However, it might be useful to offer several comments on that part of

the Board's decision dealing with the plaintiff's arguments based on the Emergency Services clause.

The Board found there was no emergency services situation created under the contract when four naval reserve battalions showed up at Port Hueneme to be fed. If a food emergency had been declared by the Food Service Officer at Port Hueneme, the plaintiff would have been entitled to an equitable adjustment under the Changes clause, for the additional unanticipated reservists fed.

The Board consulted three common dictionaries to determine their respective definitions of the term "emergency." From those definitions and the various witnesses' testimony, it opined that:

> [T]he Emergency Services clause is intended to provide for additional services occasioned by a sudden, unforeseen occurrence having a substantial impact on appellant's performance.

The Board concluded that the four reserve battalions showing up at Port Hueneme to be fed did not fit its definition. Moreover, it was the Board's view, that since the plaintiff had been advised in September 1975 that some reserve units would be showing up in the spring of 1976 for 2-weeks' training duty, that the plaintiff had ample time to plan for their coming—hence no emergency when they did show up.

It is this court's view that the Board's reading of the Emergency Services clause in the instant contract is unnecessarily restrictive. To begin with, the clause itself does not define what amounts to an emergency. The clause specifies that it is up to the Food Service Officer in charge of the mess hall facility at the local base to declare an emergency. Such declaration by the Food Service Officer requires the contractor to then provide the emergency services requested by the Food Service Officer. The clause does indicate that the emergency services would be those "in addition to the specification [IFB] services set forth in the Specification [IFB] * * *." Such emergency services requested would be considered a change to the contract within the meaning

of the Changes clause of the contract. These points seem to this court to reflect an intent to make the clause a utility tool to be invoked at the sound discretion of the Food Service Officer in just such circumstances as present here for the benefit of both parties. In other words, if an unusual meal feeding situation arises of rather substantial proportions that was not anticipated when the contract was entered into (i. e., outside of the contract specifications), this clause could be utilized to solve the problem. The Navy would be able to get the people fed and the contractor would not lose any money for doing it.

If this is not a correct reading of the clause, why else would the contract leave the matter to the local Food Service Officer on each base? If this clause could only be invoked by the Food Service Officer after some sudden, unforeseen occurrence (physical disaster such as a hurricane as testified by one of the Navy witnesses), the clause could hardly ever be appropriately used. Furthermore, declaring emergencies of that magnitude in a military context would ordinarily be the responsibility of some higher level military authority (e. g., commanding officer of the base, his superior regional officer, or even the President).

The record does indicate that at least some Food Service Officers in the field were, in fact, invoking the clause when unanticipated personnel in substantial numbers and outside of the contract specifications showed up at military mess halls and had to be accommodated.

■ Without belaboring the point any further, this court concludes that the Food Service Officer could well have invoked the Emergency Services clause under the circumstances involved in this case. Both parties at the time of contracting had not anticipated the 2-week reservists training at Port Hueneme during the contract term. In addition, the record is very unclear as to when this information regarding the reservists coming (including precise dates and numbers) was actually communicated by the Food Service Officer to the contractor for purposes of planning for the reservists'

arrival. Under these factual circumstances, this court concludes that the clause could well have been invoked and perhaps should have been invoked by the Food Service Officer to solve the Government-created problem (emergency). This is a second ground that would support the plaintiff's claim.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgement on the issue of entitlement is granted, and the defendant's cross-motion for summary judgement is denied.

This case is remanded to the Armed Services Board of Contract Appeals pursuant to Rule 149 for a determination of the amount of plaintiff's recovery. Further proceedings before this court will be stayed for a period of six (6) months from the date hereof. Defendant's counsel is designated to advise the court by letter to the trial judge of the status of the remand proceedings pursuant to Rule 149(f). Attention of counsel and the Board is also directed to Rule 150.