**BIENER GmbH, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 418–85C.**

United States Claims Court.

Aug. 8, 1989.

Reed L. von Maur, Frankfurt, West Germany, with whom was Leodis C. Matthews, for plaintiff.

Peter G. Barber, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart Schiffer, for defendant.

## OPINION

RADER, Judge.

Plaintiff, Biener GmbH (Biener), entered a contract with the United States Department of Defense (DOD) in 1980. In the contract, DOD promised to order from plaintiff all of its Direct Procurement Method (DPM) packing and containerization requirements for the Hanua/Aschaffenburg area of West Germany. The contract excluded items shipped by the Through Government Bill of Lading (TGBL) method.

Plaintiff alleges that DOD diverted business to the TGBL method of shipment and thereby breached the requirements contract. Plaintiff also asks this court to determine whether DOD negligently prepared the Best Estimated Quantities (BEQs) and whether DOD constructively terminated the contract for the convenience of the Government.

Defendant contends the contract did not cover TGBL shipping. Defendant also maintains that the cancellation clause limits plaintiff's damages for DOD's failure to order the quantities estimated by the contract.

The case at bar was assigned to this court for resolution on October 18, 1988. Both parties have moved for summary judgment. After oral argument, this court grants defendant's motion for summary judgment and denies plaintiff's cross-motion.

## FACTS

On January 28, 1980, plaintiff won a Direct Procurement Method contract to pack the personal property[1] of military personnel in the Hanua/Aschaffenburg area of the Federal Republic of Germany (Germany). In addition to conveying some property to nearby air bases, plaintiff agreed to place household goods and unaccompanied baggage such as furniture, linens, and clothing in suitable overseas shipment containers. This requirements contract originally ran from February 1, 1980 to September 30, 1982. On September 20, 1982, the DOD extended the contract to December 31, 1982.

Under the contract, plaintiff agreed to supply all of DOD's requirements for DPM shipping services. DOD agreed to obtain DPM services only from plaintiff. Section L, Clause L-3 stated:

(b) Except as otherwise provided in this contract, the Government shall order from the Contractor all the supplies or services set forth in the Schedule which are required to be purchases by the Government activity identified in the "Ordering" clause.

DOD used DPM contracts for small local moves within Germany. Of most importance to the case at bar, however, the DOD also used DPM contracts for segments of trans-Atlantic moves. For example, one DPM contractor might pack the goods Germany, another might convey the packages to port, another might load the packages on the ship, and so on, until the shipment reached its destination in the United States.

As early as May 1979, DOD began to consider an alternative method of contracting for movement of personal property across the Atlantic. Under this alternative, the TGBL method, a single contractor is responsible for the entire move from initial packing to post-transit delivery. International Through Government Bill of Lading (ITGBL) refers to international movements by the TGBL procurement method.

---

1. Personal property included household goods and unaccompanied baggage. Household goods are normal household possessions, *i.e.,* furniture, linens, clothing, etc. Unaccompanied baggage include more "essential commodities" that are shipped expeditiously. Throughout the term of the contract, Biener supplied all of DOD's requirements for shipping household goods. This dispute arose only over shipments of unaccompanied baggage.

From May 1979 until April 30, 1980, DOD tested and evaluated the TGBL method for trans-Atlantic shipment of unaccompanied baggage. The test program became an optional recommended shipment method on May 1, 1980. DOD gave code designations to various classes of goods moved by the ITGBL method. DOD designated unaccompanied baggage as Code J. Code T referred to household goods moved under ITGBL procurements. In 1979, DOD began testing Code J ITGBL shipments. Although it had used ITGBL for at least 20 years in other parts of the world, DOD had not used ITGBL in Germany.

On November 1, 1980, DOD implemented Code J ITGBL service for Germany.[2] Consequently, a large portion of the unaccompanied baggage covered by plaintiff's contract, was shipped via TGBL carriers. This affected line items in Section E, Clause E–2, items 4b(1), 4b(2) and 13 (line items) of plaintiff's contract as follows:[3]

**Best Estimated Quantity**

|  | ITEM 4b(1) | ITEM 4b(2) | ITEM 13 |
|---|---|---|---|
| 1st program year | 20,000 | 40 | 13,600 |
| 2nd program year | 25,000 | 50 | 17,000 |
| 3rd program year | 25,000 | 50 | 17,000 |
| Ext. period (3 mo.) | 420 | 4 | 430 |
| TOTAL ESTIMATE = | 70,420 GCWT | 114 GCWT | 48,030 GCWT |

**Total Services Actually Ordered**

|  |  |  |  |
|---|---|---|---|
| From Biener | 14,139 GCWT | –0– GCWT | 14,139 GCWT |
| From CONUS | 35,885 " | 104 " | 20,291 " |

On this chart, CONUS denotes continental United States shippers used to procure ITGBL services. Line items 4(b)1, 4(b)2,

2. Plaintiff attempts to create a factual dispute over the starting time of the ITGBL Code J service. Plaintiff concentrates on one exchange in the deposition of Robert Waldman, Deputy Director, Directorate of Personal Property, Headquarters, Military Traffic Management Command. Waldman at one point stated:

So, the 18th of May, undoubtedly, '79, would be the date that the solicitation was mailed out to the carriers for rates which would become effective on 1 November of '79.

Waldman Deposition, Pl. Reply, filed July 6, 1987, Ex. A at 59. However, Mr. Waldman qualified his comments shortly before this statement:

I couldn't be precise without research.

*Id.* at 58. Earlier in the same deposition, Waldman clarified that DOD solicited for the test program, not complete implementation of the ITGBL Code J service on May 18, 1979. In this earlier comment, Mr. Waldman noted that the test ran from November 1, 1979 through April 30, 1980. *Id.* at 46. Waldman's affidavit confirms that only the trial program began in May 1979. Def. Br., filed July 9, 1986, App. at 154.

Independent communications verify that the trial program began in 1979, but implementation of ITGBL Code J service was tentative until late 1980. For instance, a DOD letter dated May 28, 1980, states, "IF [THE MILITARY] STILL DESIRES TO USE DPM–MAC ..." in reference to the prospect that DPM might remain the preferred method. A DOD communication on September 20, 1980 states:

[N]O OBJECTIONS TO IMPLEMENTING CODE J FOR VOLUME 41 IF CODE J IS COST EFFECTIVE, OPERATIONAL PROBLEMS ARE RESOLVED, AND CONTRACTUAL DIFFICULTIES ARE ADDRESSED.

This shows that DOD had not reached a final decision on full implementation of Code J ITGBL in August 1980. Still another DOD communication in August 1980 states: "THIS IS TO PROVIDE AN UPDATE ON THE STATUS OF THE POTENTIAL IMPLEMENTATION OF CODE J FROM GERMANY."

In sum, several independent sources confirm Waldman's affidavit and initial recollection about the starting point of the trial program and the full Code J ITGBL program. The record, taken as a whole, does not create a factual dispute over the timing of the implementation of Code J ITGBL for the region covered by plaintiff's contract.

3. Section E, Clause E–2, Line item 4b(1) of the contract covers unaccompanied baggage for which plaintiff supplied the containers and drayage. Section E, Clause E–2, Line item 4b(2) covers unaccompanied baggage for which plaintiff supplied only the containers. Line item 13 covers palletizing of unaccompanied baggage and drayage to Rhein Main Air Base.

and 13 denote DPM classes of unaccompanied baggage which also fell under Code J ITGBL. The chart shows that the total of shipment services ordered both under DPM from plaintiff and under ITGBL from CONUS did not reach the BEQs. In each category of unaccompanied baggage, DOD ordered more ITGBL services than DPM services. DOD continued to place orders for DPM services throughout the duration of plaintiff's extended contract.

Plaintiff's contract contained a provision, Section E, Clause E–1 (Scope of Contract), governing procurement of "like services or materials" via the TGBL method:

> Excluded from the scope of this Contract is the furnishing of like services or materials which are provided incident to complete movement of personal property when purchased by the Through Government Bill of Lading method.

In the event that DOD failed to order the amount mentioned in the "Best Estimated Quantity" section of the contract, the document contained a cancellation clause. The cancellation clause guaranteed that plaintiff would receive compensation for startup and other non-recurring costs if the Government failed to order as much as anticipated. For example, Section C, Clause C–15 d(f)(iv) of the contract provides:

> The Contractor is entitled to reimbursement for preproduction and other non-recurring costs in accordance with the Clause "Cancellation Ceiling" in the event the Government orders lesser quantities than the aggregate BEQ or cancels any subsequent program year, by cancellation notice. (See L–14) For this purpose a cancellation ceiling rate has been estimated and established as shown in the clause J–7.

4. "The established ceiling rate is subject to negotiation prior to the award of the multi-year contract. The ceiling rate shall not be a factor in the evaluation for the award of the contract." Section C, Clause 15 d(f)(iv).

5. Plaintiff's breach claim is based on the following:

Warehouse Rental (23.5 Months)  DM 112,095

The parties agreed to freely negotiate the cancellation ceiling rate prior to contract award.[4]

This cancellation clause operated under three sets of circumstances. First, DOD could notify plaintiff that funds were not available for any subsequent program year. Second, DOD could fail to notify plaintiff that funds were available for the succeeding year. And finally, under Section L, Clause L–14b, DOD could fail to order the specified items in quantities up to the aggregate BEQs set forth in the contract.

The total value of the contract, based on the BEQs, was DM 5,791,338.50. The total value of the services covered under line items 4b(1), 4b(2) and 13, based on the BEQs, was DM 3,082,940. DOD ordered services covered by line items 4b(1), 4b(2), and 13 from an ITGBL contractor after full implementation of this alternative procurement method in November 1980. Plaintiff does not contest transactions under the contract other than those involving unaccompanied baggage.

On July 18, 1985, plaintiff initiated this action in the United States Claims Court under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–603 (1982 & Supp. III 1985). In its complaint, plaintiff contends that defendant committed a breach by using Code J ITGBL services to move a portion of the unaccompanied baggage covered by their requirements contract. Plaintiff also contends that the cancellation clause of the contract does not limit the defendant's liability for this alleged breach. Plaintiff seeks DM 210,737.60 in damages.[5]

Defendant responds that the contract excludes TGBL shipments from the scope of the contract. Therefore, according to defendant, the contract's cancellation clause limits plaintiff's recovery.

| | |
|---|---|
| Energy Consumption | 8,299 |
| Starting Warehouse Costs | 39,527 |
| Forklift (22.5 Months) | 24,098 |
| Forklift (23.5 Months) | 26,719 |

Plaintiff's Answer and Cross Motion, Appendix, at 90 (Defense Contract Audit Agency Report No. 2191–4B172002–017, July 24, 1984).

## DISCUSSION

### *Summary Judgment*

This action comes before the court on cross motions for summary judgment. When considering cross motions for summary judgment, this court must evaluate each party's motion on its own merits. *Mingus Constructors v. United States*, 812 F.2d 1387 (Fed.Cir.1987). Because contract interpretation is a matter of law, *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985), cases featuring contract interpretation are particularly amenable to resolution by summary judgment. *Government Sys. Advisors v. United States*, 847 F.2d 811 (Fed.Cir.1988).

RUSCC 56(c) indicates summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." RUSCC 56(e) states, "an adverse party may not rest upon the mere allegations or denials of his pleading...."

This court recognizes that inferences drawn from the facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, a mere "metaphysical doubt" will not prevent granting of a summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Where the record taken as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587, 106 S.Ct. at 1356 (citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 254, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### *Contract Interpretation*

Plaintiff entered a requirements contract with the DOD. The DOD promised to purchase all of its requirements for DPM shipping from plaintiff. Plaintiff, in turn, promised to supply those requirements. These mutual promises constitute adequate consideration for the contract. *Ronald A. Torncello & Soledad Enters., Inc. v. Unit-ed States*, 231 Ct.Cl. 20, 28–29, 681 F.2d 756, 768–69 (1982).

This court must interpret the contract as a whole to avoid conflicting provisions. *Unicon Management Corp. v. United States*, 179 Ct.Cl. 534, 375 F.2d 804 (1967). The Court of Claims stated:

> [An interpretation that] gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.

*Hol–Gar Mfg. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965).

### *Scope of Contract Clause*

■ Resolution of the case at bar depends on the interpretation of two provisions in the contract—the scope of contract clause and the cancellation clause. The scope of contract clause, Section E, Clause E–1, provides:

> Excluded from the scope of this Contract is the furnishing of *like services* or materials which are provided *incident to complete movement of personal property* when purchased by the Through Government Bill of Lading method.

(Emphasis added.) By these terms, DOD and plaintiff agreed that DOD procurement of "like services or materials" by the TGBL method would fall outside the purview of this DPM contract. Thus, plaintiff agreed to supply all of DOD's requirements for DPM packing and shipping. This contract did not cover similar packing and shipping activities procured by the TGBL method. TGBL procurements fell outside the scope of this requirements contract.

Plaintiff contended at oral argument that this clause only permits use of TGBL to acquire local services for small movements that are part of a larger DPM movement, for example, moving a piano across town. Plaintiff argues that the exclusionary language in Section E, Clause E–1 is limited to

these local moves.[6] This reading overlooks important language in the clause. Under the heading "Scope of Contract," this clause excludes "like services or materials" procured by TGBL methods. The exclusion is not limited to smaller moves or local moves, but extends to "like" moves obtained by a different procurement method.

Further, the language of the clause alludes to the type of services provided by TGBL contractors. DOD uses TGBL to procure the entire trans-Atlantic move from a single contractor. DOD uses DPM to procure a sub-element of a complete movement. Section E, Clause E-1 excludes "like services or materials which are provided incident to *complete movement of personal property*" (emphasis added) via TGBL from the scope of the contract—a reference to DOD's distinction in practice between TGBL and DPM. The "Scope of Contract" clause specifically defines the services and materials falling within and falling without the purview of the agreement.

Indeed, under the facts of this case, the scope of contract clause operated precisely as intended. Biener, the DPM contractor, provided local movements and other services not covered by ITGBL services. In late 1980, Code J of the ITGBL went into service. Code J only covered personal baggage, leaving all shipments of household goods still under the DPM method. Therefore, plaintiff handled local packing and transport of household goods under its DPM requirements contract, but ITGBL contractors handled the entire international shipment of some unaccompanied baggage.

Plaintiff's argument overlooks not only the language of the clause, but the distinctions between TGBL and DPM. The methods are mutually exclusive. DOD uses TGBL for complete international movements by a single contractor. DOD uses DPM for smaller segments of complete international movements by several contractors. Yet plaintiff contends that complete TGBL movements are small local segments of DPM movements. To the contrary, TGBL movements are not segments of any other shipment, but complete shipments in themselves. Stated otherwise, if a soldier's property is moved from his German base to his home in the United States by TGBL, no DPM contractor is involved. Conversely, if a soldier's property is packed by one DPM contractor, moved to an airport by another, and so forth, no TGBL contractor is involved. These methods are mutually exclusive.

The scope of contracts clause acknowledges this distinction between DOD's use of DPM and DOD's use of TGBL. Plaintiff's argument does not account for the distinction.

Section E, Clause E-1 limited the scope of this requirements contract to DPM service and materials. DOD did not breach the contract by ordering "like services or materials" from TGBL contractors "incident to complete movement of personal property." Code J ITGBL services fit within the exclusion found in plaintiff's contract. Therefore, shipments under Code J ITGBL were not violations of plaintiff's requirements contract.

6. Plaintiff cites the Government Bill of Lading (GBL) provisions in the Federal Acquisition Regulations (FAR) in support of this proposition. Pl. Br. filed July 6, 1987, at 5–6. Plaintiff argued that GBLs may only be used for local moves where the cost would not exceed $100.

The cited regulations, however, state:
GBL's shall *not* be used when local storage, drayage, and hauling services are procured by contract.
41 C.F.R. § 101–41.304–1 (1988) (emphasis added).
[T]he head of an agency or his designee may elect to use commercial bills of lading or commercial express receipts and commercial procedures, *rather than the regular GBL* and

related procedures to procure freight or express transportation services for certain small shipments. This discretionary authority is directed generally toward those situations involving shipments of a recurring nature where it is cumbersome and impractical to issue GBL's.
41 C.F.R. § 101–41.304–2(a) (1988) (emphasis added). Part b of this section mentions the $100 limit:
Shipments for which the transportation charges ordinarily do not exceed $100 per shipment. . . .
41 C.F.R. § 101–41.304–2(b)3(i) (1988). In sum, the TGBL method is not limited by regulation to small, local moves.

The Claims Court has acknowledged that the Government may validly exclude some services and materials from a requirements contract. Under a requirements contract, the Government promises to purchase all of its requirements for the services or materials specified in the contract. The parties to the requirements contract are free to limit the scope of the services or materials covered by their agreement. In *Ralph Construction, Inc. v. United States*, 4 Cl. Ct. 727, 733, the Claims Court recognized an exclusionary scope of contract clause in a requirements contract for routine maintenance of housing facilities. The clause stated generally:

(b) Except as otherwise provided in this contract, the Government shall order from the Contractor all the supplies or services of the Government activity named in the Schedule in excess of the quantities which the activity may itself furnish within its own capabilities.

*Ralph Constr.*, 4 Cl. Ct. at 729. The Claims Court interpreted this clause to exclude a portion of work from the requirements contract:

This reserved right was unqualified. The court cannot now rewrite a provision so clearly stated in the guise of interpretation.

*Id.* at 733.

In the case at bar, Section E, Clause E–1 excludes a defined and specific category of services or materials from the scope of plaintiff's requirements contract. The parties mutually agreed to this exclusion. Therefore, services provided by the TGBL method are outside the scope of the contract. Defendant did not breach the contract by moving Code J ITGBL goods via contractors other than plaintiff.

### Cancellation Clause

■ The contract contained a "cancellation ceiling" clause in the event DOD ordered lesser quantities than the "Best Esti-

mated Quantities" or cancelled a subsequent program year.[7] Section J, Clause J–7 estimated and established a cancellation ceiling rate for these contingencies. The established rate, however, was subject to negotiation prior to award of the entire requirements contract. Thus, defendant's failure to order the aggregate BEQ over the life of the contract triggered plaintiff's entitlement to payment of cancellation charges in accordance with the "Cancellation of Items" clause.

■ Plaintiff contends its recovery should encompass more than the cancellation clauses. Plaintiff claims damages for warehouse costs and forklift rentals hired to handle greater quantities of unaccompanied baggage. DOD elected to move significant quantities of unaccompanied baggage via TGBL. Therefore, the language in the contract does not support plaintiff's contention.

■ Because the parties agreed in Section E, Clause E–1 to limit this contract to DOD's requirements for DPM services, DOD shipments via ITGBL were excluded from their agreement. Therefore, plaintiff may not complain that DOD employed an alternative source for shipment of unaccompanied baggage. Plaintiff may justifiably complain, however, that DOD's aggregate orders under line items 4(b)1, 4(b)2 and 13 did not reach the BEQs. The contract specifies the measure of compensation for this specific complaint in the cancellation clause. If in compliance with all procedural requirements for invocation of the cancellation clause, plaintiff may justifiably claim that payment.

The cancellation clause recompenses plaintiff for some expenditures made but not recouped because DOD failed to order the BEQ:

[I]n the event the Government's actual total requirements for each contract item for all program years do not result in orders in the amounts or quantities de-

---

7. This cancellation clause also served as alternative consideration (in addition to the promise to purchase all DPM requirements) for the entire requirements contract. In this clause, defendant promises payment if it does not purchase

the quantity of services anticipated in the BEQ. Thus, this clause guaranteed plaintiff a minimum payment if defendant failed to order the BEQ.

scribed in the schedule as the aggregate Best Estimated Quantity, such event shall constitute the basis for the payment of cancellation charges in accordance with the clause entitled "Cancellation of Items."

Plaintiff's remedy is in Section L, Clause L–3. This clause provided both reimbursement to plaintiff and a quantifiable limitation on the Government's liability. It eliminated the uncertainty of the Government's liability and prevented conflict over unverifiable claims.[8] This cancellation clause established the limits of plaintiff's potential recovery.

### Best Estimated Quantities

▮ Plaintiff contends that DOD negligently computed the BEQs by figuring total shipments within its estimates rather than factoring out ITGBL shipments. In September 1979, DOD prepared the BEQs. In January 1980, the parties agreed to exclude ITGBL shipments from the scope of the contract. The record shows that DOD had not yet decided to use ITGBL for any segment of its shipping business in 1979 or early 1980.[9] Therefore, DOD prepared the BEQs on the basis of the best available information at that time, namely historical data.

Master Sergeant Moran's affidavit underscores that DOD did not negligently prepare the BEQs. He stated:

I prepared the estimates on the basis of past historical data which was referred to the three year military and civilian personnel rotation system. I used the 1977 inbound and outbound figures of the number of DPM shipments actually moved, the 1978 inbound and outbound figures, and the first 8 months of 1979 inbound and outbound figures. I adjusted the estimate for 1980 up and down based on the trend reflected on those shipments. This was the best possible based [sic] for determining the 1980, 1981 and 1982 requirements.... In September 1979 when I prepared the estimate, I did not know of any planned ITGBL usage. There was nothing in the "pipe" or channels from MTMC in Washington at that time (September 1979) of the upcoming plan to utilize the ITGBL method rather than the DPM method.

Affidavit of Master Sergeant Raymond L. Moran, filed November 30, 1988. According to the best available knowledge in September 1979, DOD prepared its estimates. Plaintiff presents no detailed affidavits from knowledgeable affiants to the contrary. Therefore, plaintiff accepts the risk of requirements falling short of the estimates set forth in the contract. *Inter-Continental Engine Serv., Inc. v. United States,* 199 Ct.Cl. 297, 462 F.2d 498 (1972).

Plaintiff contends that DOD, at the time it prepared the BEQs, wrongly withheld information that it intended to divert some shipments to ITGBL contractors. This contention overlooks that DOD had made no decision to use ITGBL in late 1979. The trial period for ITGBL from Germany was still underway. DOD had yet to evaluate the incomplete test. Indeed more than a year would pass after September 1979 before implementation of Code J ITGBL service.

---

8. Plaintiff submitted a claim for forklift rental and warehouse costs. An audit was conducted to ascertain the validity of plaintiff's claim. The auditors stated:

The results of audit are qualified because we have no means of verifying that the warehouse the contractor claims was solely for outbound service requirements under the subject contract was not used for other work during the period 1 October 1980 thru 16 September 1982, when the warehouse lease period ended.... [N]o auditable data was available to determine how the warehouse was used prior to the contract period and during the contract period.... [W]e have no

means of verifying that the forklifts were not used on other work during the claimed period....

....

[W]e could not ascertain that the warehouse was vacant during the claimed period....

Pl.Br., filed Dec. 10, 1986, App. at 89–90.

9. The vast majority of documents plaintiff cites to demonstrate a pre–1980 intent to convert to TGBL are dated in the summer and fall of 1980. At that time, DOD was considering use of TGBL. These documents, however, are not relevant to DOD's intent in January 1980, the time of contract award.

·Moreover, to the extent that some diversion would later take place, plaintiff had agreed to exclude such shipments from its contract. Plaintiff cannot validly complain that it had no notice that DOD might use TGBL methods. Plaintiff's contract contained a provision excluding TGBL methods for "like services or materials." This contract provision provided ample· notice.

DOD's BEQs were estimates and nothing more. They were not guarantees or warranties of quantity, but figures on which bidders might reasonably base their quotations. *Shader Contractors v. United States,* 149 Ct.Cl. 535, 545, 276 F.2d 1, 7 (1960) The Government need only exercise reasonable care in preparation of estimates. *Chemical Technology, Inc. v. United States,* 227 Ct.Cl. 120, 141–44, 645 F.2d 934, 946–48 (1981); *Womack v. United States,* 182 Ct.Cl. 399, 414, 389 F.2d 793, 802 (1968). The estimates need not be mathematically perfect. *Clearwater Forest Indus., Inc. v. United States,* 227 Ct.Cl. 386, 396, 650 F.2d 233, 239–40 (1981); *Ralph Constr.,* 4 Cl.Ct. at 733. DOD prepared its estimates with reasonable care under the circumstances in September 1979.

### Breach of Contract

■ Both plaintiff and defendant rely upon *Torncello,* 681 F.2d 756 as the standard for deciding whether DOD wrongfully diverted services from the requirements contract. In that case, the concurring opinions clarified that the Government commits a breach when it enters a requirements contract knowing that it can obtain the item for less elsewhere and intending to do so at the time it awarded the contract.[10] Both parties agree that the Government must have knowledge before contract award that it can obtain the same service from another source at a lower price. Both parties note that the Government must intend to use the alternate source with the lower price at the time of contract award.

Plaintiff contends that DOD knew ITGBL would be cheaper than DPM and

intended to use that alternative prior to award of this requirements contract. Defendant disputes these contentions.

Plaintiff relies on a few sentences in the affidavit of Mr. Robert Waldman to support its assertion that DOD had prior knowledge of a better deal and prior intention to use it. As indicated in footnote 2 above, the substantial weight of evidence on the record clarifies Mr. Waldman's isolated and confused utterance. DOD issued solicitations for a trial program in May of 1979 to ascertain the merits of ITGBL. This trial program ran from November of 1979 through the end of April 1980. DOD communications show that it had not reached a definitive decision to proceed with Code J ITGBL until late in 1980.

The record shows, therefore, that DOD was in the midst of its testing program for ITGBL when it entered this requirements contract for DPM services with plaintiff. DOD had not yet evaluated the results of that test, nor decided to implement ITGBL for unaccompanied baggage. DOD's conduct does not fall within the *Torncello* test.

Even assuming DOD entered the contract knowing that Code J might be implemented in Germany in the ensuing two years and that some shipments otherwise within this DPM requirements contract might be diverted to Code J carriers, DOD still acted fully responsibly. DOD secured plaintiff's agreement to exclude from the scope of the contract any such diversions.

*Torncello* does not apply to the case at bar for other reasons as well. *Torncello* involved a short form termination clause that allowed the Government to terminate with impunity. Upon termination, the *Torncello* contract limited the Government's liability to payment for services rendered. Thus, the Government offered only illusory consideration. Plaintiff's requirements contract, however, was supported by non-illusory consideration. DOD promised to employ plaintiff for all DPM services. Household goods, for instance, were shipped solely by DPM contracts. Only

---

**10.** Both plaintiff and defendant use essentially this same language to describe the holding of

the *Torncello* court. Def.Br. filed Mar. 18, 1987, at 2; Pl.Br., filed Jul. 6, 1987, at 3.

unaccompanied baggage shifted, in part, to ITGBL shippers. In addition, the contract guaranteed plaintiff a minimum compensation under the cancellation clause. This case did not involve the short-form termination clause of the *Torncello* case.

Plaintiff also relies on an Armed Services Board of Contract Appeals (Board) decision. *Viktoria Transport GmbH & Co., KG*, 88–3 B.C.A. ¶ 20,921 (1988).[11] In *Viktoria*, the Board, dealing with facts similar to those involved in the instant case, found that the exclusionary language in Section E, Clause E–1 rendered the contract illusory. The Board, therefore, rejected the clause and found that the Government breached the requirements contract. In the case at bar, the contract is not illusory but adequately supported by consideration. Accordingly, this court must give effect to the intent of the parties found in Section E, Clause E–1.

### Termination for Convenience

 At one point in its briefs, defendant appeared to concede that the contract clause governing termination for convenience of the Government applied to this case. Def. Br., filed Mar. 18, 1987, at 10. During oral argument, defendant clarified this oversight. Defendant intended to state that the cancellation clause of the contract, not the termination for convenience clause, supplies plaintiff with a remedy.

Plaintiff bases its request for a constructive termination for convenience on the same allegation that circumstances changed when DOD shifted to TGBL services. For the same reasons, most prominent of which is plaintiff's agreement in Section E, Clause E–1 to exclude TGBL from the scope of the contract, this court rejects plaintiff's request for application of the termination for convenience clause.

### CONCLUSION

The Government did not breach its contract with the contractor. The contract contained a clause that clearly reserved to the Government the option of shipping via TGBL. In the absence of a breach, plaintiff may only complain that DOD did not order the full amount of the BEQ. The contract permits plaintiff to seek payment under the cancellation clause in the event DOD's aggregate orders did not reach the BEQ. DOD also computed the BEQs with reasonable care under the circumstances. No basis exists under these facts for ordering a constructive termination for convenience of the Government.

Therefore, this court grants defendant's motion for summary judgment and simultaneously denies plaintiff's cross-motion. This court instructs the Clerk to enter judgment dismissing plaintiff's complaint.

No costs.

---

11. This court is not bound by Board decisions. *Universal Restoration v. United States,* 16 Cl.Ct. 214, 218 (1989); RUSCC General Order No. 1, 1 Cl.Ct. xxi (1982).